UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALICIA ARREDONDO, individually and acting in the interest of other current and former employees,<br><br>Plaintiff,<br><br>v.<br><br>SOUTHWESTERN & PACIFIC SPECIALTY FINANCE, INC., CHECK 'N GO OF CALIFORNIA, INC., and DOES 1 through 20, inclusive,<br><br>Defendants. | No. 1:18-cv-01737-DAD-SKO<br><br>ORDER DENYING DEFENDANT'S MOTION TO COMPEL ARBITRATION AND TO STAY THIS ACTION<br><br>(Doc. No. 19) |

This matter is before the court on defendant Southwestern & Pacific Specialty Finance, Inc.'s ("Southwestern") August 2, 2019, motion to compel arbitration and to stay this action. A hearing on the motion was held on September 4, 2019. Attorney Joseph D. Sutton appeared on behalf of plaintiff Alicia Arredondo, and attorney Jennifer G. Redmond appeared on behalf of defendant. Having considered the parties' briefing and heard from counsel, and for the reasons set forth below, defendant's motions will be denied.

**PROCEDURAL BACKGROUND**

Plaintiff's action was originally filed on November 14, 2018, in Stanislaus County Superior Court as a class action, alleging violations of California's Labor Code and Unfair

1

Competition Laws. (Doc. No. 1, Ex. 1 ("Compl.") at ¶¶ 1–2.). Plaintiff later amended her complaint to add a cause of action under California's Private Attorney General Act ("PAGA"). (Doc. No. 15 ("FAC") at ¶¶ 102–109.) Defendant removed the action to this federal court on December 21, 2018, and proceeded in litigation for approximately eight months based on the apparent belief that plaintiff had validly opted out of a May 2014 Dispute Resolution Agreement which included an arbitration provision (the "2014 DRA") on the basis of a written notification it had received from plaintiff. (Doc. No. 19-1 at 12.)

After discovering that plaintiff had signed an earlier, 2012 Dispute Resolution Agreement ("2012 DRA"), defendant asked plaintiff to stipulate to arbitration on July 17, 2019. (Doc. No. 19-2 at ¶ 8.) After plaintiff refused, defendant moved to compel arbitration on August 2, 2019. (Doc. No. 19-1.) Plaintiff opposed, arguing that (1) the 2012 DRA had been superseded by the 2014 DRA that she had signed and shortly thereafter opted out of as permitted, and (2) even in the event the 2012 DRA was binding, defendant waived its right to invoke arbitration by engaging in eight months of class action litigation in this court. (Doc. No. 21 at 5.)

## FACTUAL BACKGROUND

As alleged in the first amended complaint, plaintiff was a non-exempt, hourly worker within the meaning of California Labor Code § 500 *et seq*, employed by defendant as a Store Manager at various locations in California from April 16, 2008 through November 2018. (FAC at ¶ 12.) Defendant operates "Check-N-Go" stores which offer "payday loans, installment loans, check cashing services, money orders, and other financial services to the public."[1] (*Id.* at ¶ 10.)

According to the FAC, defendant failed to provide plaintiff with (1) pay for all hours worked, (2) pay for all overtime worked, (3) proper meal and rest breaks, (4) complete and accurate wage statements, (5) all pay owed at the time of termination, and (6) failed to maintain complete and accurate payroll records regarding her employment. (*Id.* at ¶¶ 13–35.) Plaintiff

---

[1] Plaintiff was originally hired on April 16, 2008, by Allied Cash Advance of California, LLC ("Allied"). Allied was then acquired by CNG Holdings, Inc. ("CNG") in July 2012 and became a sister company to Southwestern. (Doc. No. 19-1 at 9–10.) Axcess Financial Servicing, Inc. ("Axcess") is the Administrative Services Company for CNG. (Doc. No. 22-1 at ¶ 1.) Plaintiff was employed by Allied and Southwestern until her termination in November 2, 2018. (Doc. No. 19-1 at 9–10.)

alleges that these failures were the result of a "uniform policy and systematic scheme of wage abuse against [defendant's] hourly-paid or non-exempt employees within the State of California." (*Id.* at ¶ 21.)

Based on these allegations, plaintiff asserts a total of seven causes of action under California law. (*Id.* at ¶¶ 50–109.) Defendant has moved to compel arbitration on six of those claims and to stay the non-arbitrable PAGA claim pending resolution of the arbitration proceedings. (Doc. No. 19.)

Defendant's motion to compel arbitration relies on the 2012 DRA signed by plaintiff, which requires that "any claim . . . that arises from or relates to [her] employment with [defendant]" be subject to a dispute resolution mechanism that allows for mandatory arbitration. (Doc. No. 19-3, Ex. A § 2.2.) Defendant did not attempt to compel arbitration until the filing of this motion because it did not discover the existence of the 2012 DRA until July 2019. Prior to that, defendant "was under the impression that Plaintiff had opted out of arbitration based on the existence . . . of a written notice from Plaintiff, indicating she wished to opt out of [the 2014 DRA]." (Doc. No. 19-1 at 12.) Before the filing of this motion to compel, the parties had engaged in eight months of litigation, consisting mainly of discovery.[2] (Docs. No. 19-1 at 21–22; 21 at 13.)

Plaintiff does not dispute that she signed the 2012 DRA, (Doc. No. 21 at 5), nor does she contest that the arbitration agreements in question are subject to the Federal Arbitration Act ("FAA"). Rather, plaintiff argues that the 2012 DRA was superseded by the 2014 DRA as a matter of contract law, and that because she opted out of the latter, she is no longer obligated to arbitrate her claims against the defendant employer. (Doc. No. 21 at 5.)

According to plaintiff, she signed the 2014 DRA after defendant informed her in May 2014 that she had twenty-four hours to sign a new arbitration agreement in order to remain in her job. (Doc. No. 21-3 at ¶ 4.) The day after signing the agreement, plaintiff was informed by

---

[2] Discovery in this action appears to have been somewhat limited to date. The parties have exchanged initial discovery requests and attended one case management conference, defendant has produced approximately 600 pages of documents and twice noticed plaintiff for depositions, and plaintiff has begun class discovery. (Docs. No. 19-1 at 21–22; 21 at 13.)

3

defendant that she had the option to out of the arbitration agreement. (*Id.* at ¶ 6.) Plaintiff responded the same day she was so notified by mailing her written opt-out notification to defendant's headquarters. (*Id.*)

Although it is undisputed that defendant received plaintiff's opt-out, (Doc. No. 19-3, Ex. B), defendant does contend "that Plaintiff did not sign an arbitration agreement in May 2014 and that the only operative arbitration agreement is the 2012 DRA." (Doc. No. 22 at 5.) According to defendant, "[b]ecause the May 2014 agreement was never accepted, Plaintiff's opt-out is clearly in error and has no effect . . . [and] even if there were a binding 2014 arbitration agreement, Plaintiff opted out of it and therefore no agreement exists." (*Id.*)

## LEGAL STANDARDS

A written provision in any contract evidencing a transaction involving commerce to settle a dispute by arbitration is subject to the Federal Arbitration Act ("FAA"). 9 U.S.C. § 2. The FAA confers on the parties involved the right to obtain an order directing that arbitration proceed in the manner provided for in a contract between them. 9 U.S.C. § 4. In deciding a motion to compel arbitration, the "court's role under the Act . . . is limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000); *see also Boardman v. Pacific Seafood Group*, 822 F.3d 1011, 1017 (9th Cir. 2016).

There is an "emphatic federal policy in favor of arbitral dispute resolution." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth*, 473 U.S. 614, 631 (1985). As such, "'any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability.'" *Id.* at 626 (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24–25 (1983)). "Because waiver of the right to arbitration is disfavored, 'any party arguing waiver of arbitration bears a heavy burden of proof.'" *Fisher v. A.G. Becker Paribas Inc.*, 791 F.2d 691, 694 (9th Cir. 1986) (quoting *Belke v. Merrill Lynch, Pierce, Fenner & Smith*, 693 F.2d 1023, 1025 (11th Cir. 1982)); *see also Martin v. Yasuda*, 829 F.3d 1118, 1124 (9th Cir. 2016).

In contrast, an arbitration agreement may "be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability,' though not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (quoting *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996)). In deciding whether parties agreed to arbitrate, courts "apply ordinary state law contract principles that govern the formation of contracts to decide whether an agreement to arbitrate exists." *Norcia v. Samsung Telecomm. Am., LLC,* 845 F.3d 1279, 1283 (9th Cir. 2017), *cert. denied*, ___U.S.___, 138 S. Ct. 203 (2017) (citation and internal quotations omitted). However, courts may not apply traditional contractual defenses, like duress and unconscionability, in a broader or more stringent manner to invalidate arbitration agreements and thereby undermine FAA's purpose to "ensur[e] that private arbitration agreements are enforced according to their terms." *Concepcion*, 563 U.S. at 344 (quoting *Volt Info. Scis., Inc. v. Bd. of Trs.*, 489 U.S. 468, 478 (1989)).

Under California law, the "party seeking arbitration bears the burden of proving the existence of an arbitration agreement, and the party opposing arbitration bears the burden of proving any defense, such as unconscionability." *Pinnacle Museum Tower Assn. v. Pinnacle Mkt. Dev. (US), LLC*, 55 Cal. 4th 223, 236 (2012); *see also Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014) (noting that "the burden . . . [is] by a preponderance of the evidence"). In determining whether an agreement to arbitrate exists, "[t]he trial court sits as the trier of fact, weighing all the affidavits, declarations, and other documentary evidence, and any oral testimony the court may receive at its discretion, to reach a final determination." *Ruiz v. Moss Bros. Auto Grp., Inc.*, 232 Cal. App. 4th 836, 842 (2014) (citing *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 972 (1997), *as modified* (July 30, 1997)).

/////
/////
/////
/////
/////

5

# ANALYSIS

## I. Motion to Compel

### a. Whether the 2014 DRA and Plaintiff's Subsequent Opt-Out or the 2012 DRA Controls

#### i. Existence of the 2014 DRA

The relevant inquiry here is "whether a valid agreement to arbitrate exists." *Lee v. Intelius, Inc.*, 737 F.3d 1254, 1261 (9th Cir. 2013) (quoting *Chiron Corp*, 207 F.3d at 1130).

It is undisputed that plaintiff signed the 2012 DRA, (Doc. No. 21 at 5), and viewed the 2014 DRA. (Doc. 22-1 at ¶ 3.) It is also undisputed that defendant received plaintiff's written opt-out from the 2014 DRA. (Doc. No. 19-3, Ex. B.)[3]

The parties' dispute instead centers on whether plaintiff signed the 2014 DRA, and which DRA, if any, controls now. Plaintiff asserts that she signed the 2014 DRA, that it superseded the 2012 DRA, and that her subsequent opt-out from the 2014 DRA precludes her from being compelled to arbitration. (Doc. No. 21.) Defendant claims that "[p]laintiff did not sign an arbitration agreement in May 2014 and that the only operative arbitration agreement is the 2012 DRA," and that "even if there were a binding 2014 arbitration agreement, Plaintiff opted out of it and therefore no such agreement exists." (Doc. No. 22 at 5.)

"[U]nder California law, mutual assent is a required element of contract formation." *Knutson*, 771 F.3d at 565. "Mutual assent may be manifested by written or spoken words[] or by conduct . . . and acceptance of contract terms may be implied through action or inaction." *Id.* (citing *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 593–95 (1991) and *Binder v. Aetna Life Ins.*, 75 Cal. App. 4th 832, 850 (1999)) (internal quotation marks omitted). "Thus, 'an offeree, knowing that an offer has been made to him but not knowing all of its terms, may be held to have accepted, by his conduct, whatever terms the offer contains.'" *Id.* (quoting *Windsor Mills, Inc. v. Collins & Aikman Corp.*, 25 Cal. App. 3d 987, 991 (1972)). "Courts must determine whether the outward manifestations of consent would lead a reasonable person to believe the

---

[3] Moreover, there is no legitimate dispute as to the terms of the arbitration provision within the 2014 DRA. (*See* Doc. Nos. 19-1 at 21; 19-2 at 8; 21-1 at ¶ 6; 21-2 and 22-1 at ¶ 3, 6.)

offeree has assented to the agreement." *Id.* However, "a signed agreement is not necessary to a valid arbitration agreement, and a party's acceptance may be implied." *Paxton v. Macy's W. Stores, Inc.*, No. 1:18-cv-00132-LJO-SKO, 2018 WL 4297763, at *4 (E.D. Cal. Sept. 7, 2018). Ultimately, "[w]here the existence of a contract is at issue and the evidence is conflicting or admits of more than one inference, it is for the trier of fact to determine whether the contract actually existed." *San Joaquin Gen. Hosp. v. United Healthcare Ins.*, No. 2:16-cv-01904-KJM-EFB, 2017 WL 1093835, at *2 (E.D. Cal. Mar. 23, 2017) (citing *Bustamante v. Intuit, Inc.*, 141 Cal. App. 4th 199, 208 (2006)).

In her declaration in support of her opposition to defendant's motion, plaintiff states that she signed the 2014 DRA after learning that she "had twenty-four hours to sign the agreement or else [she] would lose [her] job." (Doc. No. 21-3 at 2.) She also declares that she sent an email to Amy Humphreys, her Regional Manager, confirming that she had signed the 2014 DRA. (*Id.*) According to plaintiff, the following day Ms. Humphreys sent her an email notifying plaintiff that she had the right to opt-out of the 2014 DRA she had just signed. (*Id.*) It is undisputed that plaintiff did in fact send defendant written notice that she was opting out of the DRA. (*Id.*; Doc. No. 19-3, Ex. B.) That opt-out reads:

> I, Alicia [Arredondo] opt out of the Dispute Resolution Agreement that was implemented in early May of 2014. I signed before I knew that I could opt out.

(Doc. No. 19-3, Ex. B.)

Plaintiff's recollections about how and when she received, signed, and opted out of the 2014 DRA are detailed and her description aligns with the period during which defendant had requested that its other employees sign arbitration agreements. (*Compare* Doc. No. 21-3, *with* Doc. No. 19-2 at 8.) Plaintiff's declaration is also consistent with the opt-out notification that she undisputedly sent to her employer in 2014 in which she admitted to signing the 2014 DRA, while at the same time indicating her desire to opt-out of that agreement upon being notified that she could. (*Compare* Doc. No. 21-3, *with* Doc. No. 19-3, Ex. B.)

Defendant points out both that plaintiff has not produced the 2014 DRA or her emails to and those from Ms. Humphreys and that plaintiff was able to access and print copies of the 2012

7

DRA at any time during her employment.[4]  (Doc. No. 19-3 at 3)  Because the terms and content of the 2014 DRA are not placed in question by the pending motion, however, that plaintiff does not have a signed copy of the 2014 is clearly not dispositive of the question at issue.  This is particularly true since plaintiff contends that "neither she nor any of her colleagues were offered or given a copy or print out" of that agreement.  (Doc. No. 21 at 7.)

The more relevant and critical inquiry in resolving the pending motion is whether plaintiff agreed to the 2014 DRA.  Defendant has produced a declaration from Catherine Reinstatler, a Human Resources Business Partner for defendant, stating that plaintiff never signed the 2014 DRA.  (Doc. No. 22-1.)  According to Ms. Reinstatler, she has reviewed defendant's business records again[5] and discovered an archived Excel spreadsheet from the Success Factors platform, a now defunct system, apparently indicating that plaintiff was presented with, but did not "sign/complete," the 2014 DRA.  (Doc. No. 22-1 at ¶ 3.)  She reached this conclusion after comparing the record of plaintiff's allegedly unsigned agreement with those of signed agreements, which do not match.  (Doc. No. 22-1 at 2.)  However, it also appears that Ms. Reinstatler did not compare the record of plaintiff's agreement, which was marked as "deleted," to those of other unsigned agreements to confirm its integrity.[6]  (*Id.*)

Of course, "declarations are often self-serving . . . because the party submitting it would use the declaration to support his or her position."  *Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495,

---

[4] To be sure, defendant has not produced evidence contradicting plaintiff's declaration about her communications with Ms. Humphreys or her fellow employees.  Neither has it established that plaintiff could access and print copies of the 2014 DRA.  (*See* Doc. No. 22-1).

[5] This information is set forth in Ms. Reinstatler's supplemental declaration.  (Doc. No. 22-1.)  In her previous declaration, she stated that she had reviewed the defendant's business records and concluded that "[t]here is no record that Plaintiff received or signed" the 2014 DRA.  (Doc. No. 19-3 at ¶ 11.)  She later amended this statement in the supplemental declaration after re-reviewing defendant's business records and conceded that "Plaintiff *was* presented with an agreement in May 2014 but did not sign/complete it."  (Doc. No. 22-1 at ¶ 6) (emphasis in original).

[6] The court notes that during the discovery phase of this litigation defendant failed to discover the 2012 DRA, (Doc. No. 19-1 at 12), and the form 2014 DRA sent to plaintiff, (*Id.*), and thereafter erroneously represented that "there was no record that Plaintiff was presented with a form agreement in or around May 2014."  (Doc. No. 22-1 at ¶ 6.)  These lapses raise at least some question regarding the reliability of defendant's record searches.

8

497 (9th Cir. 2015). However, both parties in this case rely primarily on their declarations to support their assertions regarding the existence of a 2014 arbitration agreement between plaintiff and defendant. Because "the evidence is conflicting or admits of more than one inference," *San Joaquin Gen. Hosp.*, 2017 WL 1093835, at *2 (citing *Bustamante*, 141 Cal. App. 4th at 208), in determining whether an agreement to arbitrate exists "the trial court sits as the trier of fact, weighing all the affidavits, declarations, and other documentary evidence . . . to reach a final determination." *Ruiz*, 232 Cal. App. 4th at 842 (citing *Engalla*, *Inc.*, 15 Cal. 4th at 972).

As noted above, the declaration submitted by plaintiff in opposition to the pending motion is both detailed and corroborated by the written opt-out she sent to defendant in 2014, in which she stated, "I *signed* before I knew that I could opt out." (Doc. No. 19-3) (emphasis added). There is little reason to believe that plaintiff would have invented the fact that she had signed the 2014 DRA in an attempt to opt-out of that very agreement. There is absolutely no reason to believe that plaintiff could have anticipated five years ago that whether she had signed the 2014 DRA would become relevant to the litigation today. That plaintiff had no reason to fabricate in 2014 makes her written opt-out and her current declaration particularly compelling and credible. Indeed, defendant apparently found the opt-out credible enough that it made no effort to locate the 2014 DRA or attack plaintiff's opt-out and declined to invoke arbitration on the basis of the opt-out until it belatedly discovered the 2012 DRA. The court sees no reason now to doubt the veracity of plaintiff's statement in 2014 that she was opting out of the agreement that she had then just signed or the validity of her opt-out from that agreement itself. (Doc. No. 19-1 at 12.)

While the Reinstatler supplemental declaration offers some support for defendant's position that plaintiff did not sign the 2014 DRA, the business records presented by defendant do not conclusively establish as much. They do not explain, for instance, why the record of plaintiff's arbitration agreement is marked as "deleted" and they do not indicate whether plaintiff's business record was presented in its original and unmodified form. Moreover, and as noted above, defendant's missteps during the discovery phase of this litigation does not inspire confidence in its assessment of its records.

/////

9

Finally, while it is true that plaintiff's declaration as to her communications with Ms. Humphreys and her fellow employees has not been corroborated, defendant has not come forward with any evidence contradicting plaintiff's declaration, even though defendant is the party best positioned to contact its own employees.

Having carefully reviewed the evidence presented with respect to the pending motion, the court concludes that plaintiff signed the 2014 DRA.

### i. Whether the 2014 DRA Supersedes the 2012 DRA

The next question is whether the 2014 DRA superseded the 2012 DRA and whether plaintiff's opt-out from the 2014 DRA absolves her of an obligation to arbitrate. Plaintiff argues that "[i]t is a well-settled principle of contract law that a new agreement between the same parties on the same subject supersedes the old agreement." (Doc. No. 21 at 9) (citing *Mumin v. Uber Techs., Inc.*, 239 F. Supp. 3d 507, 524 (E.D.N.Y. 2017)). Defendant acknowledges that this is a "non-controversial principle"[7] and the court agrees. (Doc. No. 22 at 9); *see, e.g.*, *Rejuso v. Brookdale Senior Living Communities, Inc.*, 2018 WL 6174764, at *7 (C.D. Cal. June 5, 2018) (finding that a subsequent arbitration agreement superseded a previous one).

Moreover, well-settled principles of contract law dictate that a previous contract is superseded by a subsequent one by the same party on the same issues. *See, e.g.*, *NLRB v. Int'l Union of Operating Eng'rs,* 323 F.2d 545, 548 (9th Cir. 1963) ("[S]ince the contracts were entered into by the same parties and cover the same subject matter, it is a well settled principle of law that the later contract supersedes the former contract as to inconsistent provisions") (citing *In re Ferrero's Estate*, 142 Cal. App. 2d 473, 298 P.2d 604, 607, 608 (1956) and Restatement, Contracts § 408 (1932)); *Mumin v. Uber Techs., Inc.*, 239 F. Supp. 3d 507, 524 (E.D.N.Y. 2017) ("It is a well settled principle of contract law that a new agreement between the same parties on the same subject matter supersedes the old agreement.") (citing *Ottawa Office Integration Inc. v. FTF Bus. Sys., Inc.*, 132 F. Supp. 2d 215, 219 (S.D.N.Y. 2001)).

/////

---

[7] Nonetheless, defendant asserts that this principle is "wholly inapplicable" here, but does not persuasively explain why that is the case. (Doc. No. 22 at 9.)

10

By offering plaintiff a new arbitration agreement[8]—one that provided her with the option to opt-out of that agreement, even though she had already signed a previous agreement—defendant effectively offered her another bite at the apple. It would be inconsistent to construe that act as meaningless and ineffective, as defendant now argues. (Doc. No. 22 at 9.) Thus, the court concludes that when plaintiff signed the 2014 DRA, that agreement extinguished and superseded the 2012 DRA.

Defendant next argues that "even if Plaintiff had signed a subsequent agreement, by opting out Plaintiff repudiated her acceptance of that agreement," and, alternatively, that an "opt-out evidences rejection of the agreement." (Doc. No. 22 at 8–9)

Repudiation, which occurs when a party makes "a positive, unconditional, and unequivocal declaration . . . not to perform," indicating the intention to breach, does not apply in this case. *Minidoka Irrigation Dist. v. U.S. Dep't of Interior*, 154 F.3d 924, 926 (9th Cir. 1998) (citing *Dingley v. Oler,* 117 U.S. 490, 502 (1886)); *see also* Restatement (Second) of Contracts § 250 (1981) ("A repudiation is . . . a statement by the obligor to the obligee indicating that the obligor will commit a breach."); 1 WITKIN, SUMMARY 11TH CONTRACTS § 888–889 (2019) (explaining that "[i]f the promisor expressly repudiates the contract by an unequivocal refusal to perform, he or she is guilty of an anticipatory breach" and "[a]n anticipatory breach will also result from an implied repudiation, where the promisor puts it out of his or her power to perform"). Plaintiff opted out of the 2014 DRA according to the agreement's own terms; thus, there was no intention to breach and, by definition, her act cannot be construed as repudiation.

Moreover, whether an "opt out evidences rejection of the agreement" does not change the fact that the plaintiff *first* accepted the 2014 DRA, and *then* opted out of it pursuant to its very terms. "Under California law, a contract will be enforced if it is sufficiently definite (and this is a question of law) for the court to ascertain the parties' obligations and to determine whether those obligations have been performed or breached." *Bustamante*, 141 Cal. App. 4th at 209 (citing *Ersa Grae Corp. v. Fluor Corp.*, 1 Cal. App. 4th 613, 623 (1991) (collecting cases)). Enforcing

---

[8] The main difference is that the 2014 DRA replaces Allied, the named counterparty on the 2012 DRA, with Axcess, the Administrative Services Company for CNG, Allied's controlling entity.

the 2014 DRA means giving effect to its terms, including the provision permitting parties to opt out of arbitration by submitting written notice to the defendant. (Doc. No. 21-2 at § 3.5.1.) Plaintiff duly complied with this requirement and defendant has provided no basis upon which to conclude that this provision should not be enforced as written.

Finally, defendant seems to suggest that opting out of or repudiating a signed agreement revives a preceding agreement. However, revival of an extinguished contract is only available under limited circumstances, such as when a superseding contract is deemed void or unenforceable. *See Rejuso v. Brookdale Senior Living Cmtys., Inc.*, No. CV 17-5227-DMG (RAO), 2018 WL 6173384, at *4 (C.D. Cal. Nov. 13, 2018) (determining "that the Arbitration Provision is unenforceable operates to revive the [dispute resolution agreement], assuming that the [latter] is valid and enforceable"); Restatement 2d of Contracts § 279 cmt. B (noting that prior contracts can be revived if "the substituted contract is vulnerable on such grounds as mistake, misrepresentation, duress or conscionability"); *Airs Int'l, Inc. v. Perfect Scents Distributions, Ltd.*, 902 F. Supp. 1141, 1147 (N.D. Cal. 1995) (collecting cases). Aside from the issue of whether the 2014 DRA was signed by plaintiff, which the court has resolved above, neither party argues that the 2012 or 2014 DRAs are generally unenforceable. Thus, there is no basis upon which to revive the 2012 DRA.

Because plaintiff has presented evidence which the court has found sufficient to establish that she signed the 2014 DRA, the court concludes that the 2012 DRA was extinguished and superseded by the 2014 DRA and that her immediate, subsequent opt-out from the arbitration agreement was effective. Defendant has therefore failed to meet its burden of proving that a valid, enforceable, and operative arbitration agreement with plaintiff exists.

Accordingly, defendant's motion to compel arbitration will be denied.

**II.    Motion to Stay**

Defendant has also moved to stay plaintiff's non-arbitrable PAGA claims. (Doc. No. 19-1.) Because the court has found that plaintiff is not required to arbitrate her claims against defendant, and because the court finds no other basis to impose a stay, defendant's motion to stay will also be denied.

12

**CONCLUSION**

For the reasons set forth above, defendant's motion to compel arbitration and to stay this action, (Doc. No. 19), is denied.

IT IS SO ORDERED.

Dated: **September 22, 2019**

UNITED STATES DISTRICT JUDGE