1
2
3
4
5
6
7

8                    UNITED STATES DISTRICT COURT

9               FOR THE EASTERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| 11   ALICIA ARREDONDO, | No. 1:18-cv-01737-DAD-SKO |
| 12         Plaintiff, | |
| 13    v. | ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT |
| 14   SOUTHWESTERN & PACIFIC SPECIALTY FINANCE, INC., dba Check | |
| 15   'N Go of California, | (Doc. No. 44) |
| 16         Defendant. | |
| 17 | |

18          This matter is before the court on plaintiff Alicia Arredondo's motion for preliminary

19    approval of class action settlement of plaintiff's wage and hour class action lawsuit against

20    defendant Southwestern & Pacific Specialty Finance, Inc.  (Doc. No. 44.)  Pursuant to General

21    Order No. 617 addressing the public health emergency posed by the COVID-19 pandemic, the

22    court took the matter under submission to be decided on the papers.  (Doc. No. 45.)  For the

23    reasons set forth below, the court will grant plaintiff's motion for preliminary approval of class

24    action settlement.

25                                    **BACKGROUND**

26          Defendant is in the business of owning and operating Check 'N Go stores offering

27    "payday loans, installment loans, check cashing services, money orders, and other financial

28    /////

                                          1

services."[1]  (Doc. No. 48 at ¶¶ 7, 10.)  For over ten years, plaintiff was an hourly-paid, non-exempt employee of defendant, until her termination in November 2018.  (Doc. No. 48 at ¶ 12.)

As summarized in plaintiff's pending motion,[2] on November 14, 2018, plaintiff initially filed her class action complaint in Stanislaus County Superior Court seeking to represent the following class:  "[a]ll persons who are or have been employed by Defendants as non-exempt, hourly employees within the State of California within four years prior to the filing of the original complaint to the final disposition of this case."  (Doc. No. 44-1 at 7.)  The initial complaint asserted several wage and hour causes of action, including violations of California's Unfair Competition Law and provisions of the California Labor Code.  (*Id.*)  More specifically, as detailed in plaintiff's counsel's declaration filed in support of the pending motion, plaintiff alleges that she and the putative class members were required to work off-the-clock both before and after their shifts to open and close defendant's stores.  (Doc. No. 44-2 at ¶ 7.)

On December 21, 2018, defendant removed this action to this federal court based on diversity jurisdiction (28 U.S.C. §§ 1332(a), 1441(a)–(c), 1446(a)) and the Class Action Fairness Act of 2005 (28 U.S.C. §§ 1332(d)(2), 1453) because plaintiff and defendant are citizens of different states and the amount in controversy in this action exceeds $5,000,000.  (Doc. Nos. 1 at 2; 44-1 at 7.)

On May 23, 2019, plaintiff filed her first amended class and representative action complaint ("FAC"), adding a claim under the California Labor Code's Private Attorney Generals Act of 2004 ("PAGA") (Cal. Lab. Code §§ 2698–2699.6).  (Doc. No. 44-1 at 7.)  After engaging in written discovery, defendant filed a motion to compel arbitration of plaintiff's individual wage and hour claims.  (*Id.* at 8.)  This court denied defendant's motion.  (Doc. No. 25.)  However,

---

[1]  In plaintiff's pending motion, she noted that defendant "ceased operations in California effective December 31, 2020, and all employees within California who make up the putative class were terminated as of that date."  (Doc. No. 44-1 at 6 n.2.)

[2]  Following the filing of plaintiff's motion, the court directed the parties to submit supplemental briefing addressing various issues identified by the court in connection with their proposed settlement.  (Doc. Nos. 49, 51.)  The parties submitted declarations attaching exhibits in response to the court's directive.  (Doc. Nos. 50, 52, 53, 54.)

1    plaintiff contends that the written discovery did reveal that "a vast majority of the putative class

2    was subject to binding arbitration agreements." (Doc. No. 44-1 at 8.)  The parties later agreed

3    that only 18 of the 1,757 putative class members were not bound by arbitration agreements. (*Id.*

4    at 9.)  As such, plaintiff agreed to dismiss her class claims and enter mediation with defendant to

5    address the remaining PAGA claim. (*Id.*)  On October 26, 2020, this court entered an order upon

6    the parties' stipulation dismissing plaintiff's class claims, leaving only her individual wage and

7    hour claims and the representative PAGA claim. (Doc. No. 41.)

8         On January 25, 2021, the parties reached the proposed settlement now before the court

9    after an "arms-length mediation with Jeff Ross."[3] (Doc. No. 44-1 at 9.)  At the mediation, the

10   parties negotiated a settlement encompassing 690 non-exempt employees who worked during the

11   "PAGA period"—from February 25, 2018 through December 31, 2020. (*Id.*)  The material terms

12   of the settlement, which are set forth below, were proposed by mediator Ross as his mediator's

13   proposal that both parties accepted. (*Id.*)  On June 9, 2021, plaintiff filed the pending unopposed

14   motion for preliminary approval of the proposed class action settlement. (Doc. No. 44.)

15        The proposed settlement was premised on plaintiff amending her FAC to re-plead the

16   class allegations previously dismissed for the 690 employees who worked for defendant between

17   February 25, 2018 and December 31, 2020. (Doc. No. 44-1 at 9–10.)  Shortly after filing the

18   pending motion, plaintiff filed the second amended class and representative action complaint

19   ("SAC").[4] (Doc. No. 48.)  Plaintiff maintains that "[t]his was done in order to maximize the

20   monetary recovery for the 690 workers who fell within the PAGA period (February 25, 2018 to

21   _____

22   [3]  A Google search reveals a Jeffrey A. Ross located in Berkeley, California who is "a full-time
     mediator specializing exclusively in the mediation of employment matters[, including] . . . both
     individual and class action cases." *See* Jeffrey A. Ross, Employment Mediation (last visited Nov.

23   17, 2021), http://www.jeffrossmediation.com/.

24   [4]  The SAC includes individual, representative, and class claims for:  (1) failure to pay minimum
     and overtime rates under California Labor Code §§ 510, 512, 1194, 1194.2, and 1198; (2) failure

25   to provide meal periods under California Labor Code §§ 226.7, 512, and 1198; (3) failure to
     provide rest breaks under California Labor Code §§ 226.7 and 1198; (4) failure to furnish

26   accurate itemized wage statements under California Labor Code § 226; (5) failure to timely pay
     final wages at termination under California Labor Code §§ 201-203; (6) violations of California's

27   Unfair Competition Law (Cal. Bus. Prof. Code §§ 17200, *et seq.*); and (7) a representative action

28   for civil penalties under PAGA. (Doc. No. 48.)

                                                    3

1    December 31, 2020) and to afford Defendant with class-wide relief."  (Doc. No. 44-1 at 10.)  The

2    SAC reflected the parties' settlement that the class period would be narrowed to the PAGA period

3    and would re-plead the class claims.  (*See* Doc. No. 48.)

4           In her pending motion plaintiff seeks an order from this court:  (1) certifying the

5    settlement class, with appointment of plaintiff as class representative, appointment of plaintiff's

6    counsel as class counsel, and approval of Phoenix Class Action Administration Solutions

7    ("Phoenix") as the settlement administrator; (2) preliminarily approving the parties' proposed

8    settlement; (3) approving and directing the mailing of the proposed class notice; and (4)

9    scheduling the hearing date for the final approval of the class settlement.

10                            **THE PROPOSED SETTLEMENT**

11   **A.    The Class**

12          As stated in the parties' settlement agreement, the parties request certification of the

13   following putative class of an estimated 690 individuals for settlement purposes:

14          "Class Member" means the named Plaintiff in this Action and any
        non-exempt employee who was employed by Defendant within the
15      State of California at any point from February 25, 2018 to date of
        preliminary approval. Class Member does not include any
16      individuals who already have resolved the claims asserted in the
        Action, whether by settlement or adjudication, or any of the thirty-
17      three (33) individuals who have filed, or were prepared to file by
        and through Class Counsel, demands for individual arbitration. The
18      group of all Class Members meeting the definition above are
        collectively referred to as the "Settlement Class."
19

20   (Doc. No. 54-1 at 2.)

21   **B.    The Class Period**

22          As stated in the parties' settlement agreement, the class period is "[t]he period from

23   February 25, 2018 through the date of Preliminary Approval."  (Doc. No. 54-1 at 2.)

24   "Preliminary Approval of the Settlement" is further defined as "the District Court's granting

25   preliminary approval of the Settlement Agreement without material change, or with material

26   changes to the Settlement to which the Parties agree."  (*Id.* at 5.)  Accordingly, the class period

27   /////

28   /////

will run from February 25, 2018 through the date of this order.[5]

**C.      The Release of Claims**

The parties' settlement agreement provides for the following release of claims by class members:

> In consideration of the Settlement, each Class Member who does not timely submit a Request for Exclusion from the Settlement releases any and all wage and hour claims, rights, demands, liabilities and causes of action of any nature or description asserted in the Action, arising from or related to the facts and claims alleged in the Action, or that could have been alleged in the Action based on the facts and claims alleged in the Complaint, as amended. The Class Release includes all claims for unpaid wages, including failure to pay minimum wages, straight time compensation, overtime compensation, double-time compensation, and interest; the calculation of the regular rate of pay; missed meal period, rest period, and recover period wages/premiums; payment for all hours worked, including off-the-clock work; wage statements; failure to keep accurate records; failure to provide meal periods, rest periods, and recovery periods; unfair business practices related to these claims; penalties, including recordkeeping penalties, wage statement penalties, minimum wage penalties, and waiting time penalties; and attorneys' fees and costs. The Class Release includes all such claims arising under: California Labor Code sections 200, 201, 202, 203, 204, 210, 216, 218, 218.5, 218.6, 221, 222, 223, 224, 225, 225.5, 226, 226.3, 226.7, 256, 510, 511, 512, 558, 1174, 1174.5, 1182.12, 1194, 1194.2, 1197, 1197.1, 1197.2, 1198, 1198.5, 1199, 1698 *et seq.,* 2699 *et seq.*; all claims relating to these claims under the Wage Orders of the California Industrial Welfare Commission (including IWC Wage Order No. 4-2001, 8 CCR § 11100), California Code of Regulations tit. 8 section 3395, the California Private Attorneys General Act of 2004 (PAGA), California Business and Professions Code section 17200, *et seq.,* California Civil Code sections 3287, 3288; California Code of Civil Procedure § 1021.5; and the California common law of contract. This release excludes claims not permitted by law. The Class Release includes all such claims, whether known or unknown, suspected or unsuspected, by the Class Members or any of them.

(Doc. No. 54-1 at 16.)

/////

---

[5] The SAC, which is the operative complaint, provides for a class period that ends on December 31, 2020 rather than through the date of preliminary approval as stated in the settlement agreement. (*Compare* Doc. No. 48 at ¶ 37 *with* Doc. No. 54-1 at 2.) In supplemental briefing, plaintiff's counsel clarified that the correct class period runs through the date of preliminary approval. (Doc. No. 50 at ¶ 3.) Plaintiff's counsel also represented that he would be filing a third amended complaint to update the class period. (*Id.* at ¶ 4.) As of the date of this order, however, no third amended complaint has been filed.

There is also a separate release of claims provision pertaining to plaintiff individually:

> In consideration of her requested Class Representative Service Award, her Individual Settlement Payment, and the other terms and conditions of the Settlement, Plaintiff releases any and all claims against Defendant and its related persons and entities, including but not limited to those raised in the Action; those released by Class Members as set forth below; and those arising from or related to Plaintiffs employment with Defendant (the "Plaintiffs Released Claims"). Plaintiffs Released Claims include all claims, whether known or unknown. Thus, even if Plaintiff discovers facts in addition to or different from those that she now knows or believes to be true with respect to the subject matter of her Released Claims, those claims will remain released and forever barred. Therefore, because Plaintiff is granting a general release, she expressly waives and relinquishes the provisions, rights and benefits of section 1542 of the California Civil Code, which reads:
>
> > A general release does not extend to claims which the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.

(Doc. No. 54-1 at 15–16.)

## D.    Summary of the Settlement Terms

Under the parties' settlement agreement, defendant will pay a gross settlement amount of $1,250,000.00 allocated as follows:  (1) up to $416,666.25 (or 33.33%) for attorneys' fees and up to $20,000.00 (or 1.6%) for attorneys' costs; (2) $10,000.00 (or 0.8%) for an incentive award for the representative plaintiff; (3) $100,000.00 (or 8.0%) in civil PAGA penalties;[6] and (4) an estimated $10,500.00 (or 0.84%) for settlement administration costs.  (Doc. No. 54-1 at 8–10.)

Assuming these allocations are awarded in full, approximately $717,833.75 in a net settlement amount will be available for distribution to class members who do not submit a timely and valid request to be excluded from the settlement.[7]  (Id. at 8–9.)  In his declaration supporting the pending motion for preliminary approval plaintiff's counsel contends that the proposed settlement would result in an average payment of approximately $1,040.33 to each class member

---

[6]  Under PAGA and the settlement agreement, 75% of the civil penalties, or $75,000, will go to the California Labor and Workforce Development Agency ("LWDA"), and the remaining 25%, or $25,000, will be reserved for the net settlement amount.  (Doc. No. 54-1 at 9–10.)

[7]  Only $75,000.00 is deducted for the PAGA allocation.

1 (the net settlement amount of $717,833.75 divided by the estimated 690 class members).  (Doc.

2 No. 44-2 at ¶ 38.)  Notwithstanding plaintiff counsel's estimated average payment to the class

3 members, the settlement agreement provides that each payment will be allocated on a *pro rata*

4 basis:

> A Participating Class Member's Individual Settlement Payment
> shall be calculated by multiplying the Net Settlement Amount by
> the ratio of (a) the number of pay periods worked by the
> Participating Class Member for Defendant between February 25,
> 2018 through December 31, 2020, and (b) the total number of pay
> periods worked by all Participating Class Members during this
> period.

9 (Doc. No. 54-1 at 8.)  Each class member's payment is subject to specified tax treatment:  (a)

10 85% of the payment will be treated as settling the statutory and civil penalties, which will not be

11 reduced by payroll tax withholding and deduction; and (2) 15% of the payment will be treated as

12 settling the claims for unpaid wages, which will be subject to applicable payroll tax withholding

13 and deductions.  (*Id.*)  The settlement administrator will issue an IRS Form 1099 for the 85% non-

14 wage portion, and an IRS Form W-2 for the 15% wage portion.  (*Id.*)  After the funds are

15 distributed to the class members, the class members will have 180 calendar days to cash their

16 checks.  (*Id.* at 15.)  Any remaining amounts from uncashed checks will either revert to class

17 members who did cash checks (if the amount remaining is $10,000.00 or more) or be donated to

18 California Rural Legal Assistance (if the amount remaining is less than $10,000.00).  (*Id.*)

19 **LEGAL STANDARDS**

20 **A.      Rule 23 Settlements**

21       Class actions require the approval of the district court before settlement.  Fed. R. Civ. P.

22 23(e) ("The claims, issues, or defenses of a certified class—or a class proposed to be certified for

23 purposes of settlement—may be settled, voluntarily dismissed, or compromised only with the

24 court's approval.").  "Approval under 23(e) involves a two-step process in which the Court first

25 determines whether a proposed class action settlement deserves preliminary approval and then,

26 after notice is given to class members, whether final approval is warranted."  *Nat'l Rural*

27 *Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 525 (C.D. Cal. 2004).

28 /////

The first step in the two-step process is preliminary approval.  During preliminary approval, the court conducts a preliminary fairness evaluation to determine if notice of the class action settlement should issue to class members and, if applicable, whether the proposed settlement class should be certified.  *See* David F. Herr, *Ann. Manual Complex Lit.* § 21.632 (4th ed.).  Under Rule 23(e)(1), the court must direct notice to all class members who would be bound by the settlement proposal if the parties show that "the court will likely be able to:"  (i) approve the proposal under Rule 23(e)(2)'s fair, reasonable, and adequate standard; and (ii) certify the proposed settlement class.  Fed. R. Civ. P. 23(e)(1); *see also Lounibos v. Keypoint Gov't Sols. Inc.*, No. 12-cv-00636-JST, 2014 WL 558675, at *5 (N.D. Cal. Feb. 10, 2014) (quoting *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007)) (noting that federal courts generally grant preliminary approval if "the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval").

The second step is the final approval.  During final approval, "[i]f the proposal would bind class members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  In doing so, the court must consider several factors, including whether:  "the class representatives and class counsel have adequately represented the class"; "the proposal was negotiated at arm's length"; "the proposal treats class members equitably relative to each other"; and "the relief provided for the class is adequate."  *Id.*  When considering whether "the relief provided for the class is adequate," the court should also take into account:

> (i) the costs, risks, and delay of trial and appeal;

> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

> (iii) the terms of any proposed award of attorney's fees, including timing of payment; and

> (iv) any agreement required to be identified under Rule 23(e)(3).

*Id.*  In addition to the two-step review process, Rule 23(e) also requires that:  (i) the parties seeking approval file a statement identifying the settlement agreement; (ii) class members be given an opportunity to object; and (iii) no payment be made in connection with forgoing or withdrawing an objection, or forgoing, dismissing, or abandoning an appeal.  Fed. R. Civ. P. 23(e)(3), (5).

"Courts have long recognized that settlement class actions present unique due process concerns for absent class members."  *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) (internal quotation marks and citations omitted).  To protect the rights of absent class members, Rule 23(e) requires that the court approve such settlements "only after a fairness hearing and a determination that the settlement is fair, reasonable, and adequate."  *Id.* at 946.  When approval is sought of a settlement negotiated before formal class certification, "there is an even greater potential for a breach of fiduciary duty owed the class during settlement."  *Id.* In such circumstances, the "settlement approval requires a higher standard of fairness" and a "more exacting review" so as "to ensure that class representatives and their counsel do not secure a disproportionate benefit at the expense of the unnamed plaintiffs who class counsel had a duty to represent."  *Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012) (internal quotation marks and citations omitted).  Rule 23 also "demand[s] undiluted, even heightened, attention" to the certification requirements when class certification is sought only for purposes of settlement. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997).  Accordingly, the district court must examine the propriety of certification under Rule 23 both at this preliminary stage and at a later fairness hearing.  *See, e.g.*, *Ogbuehi v. Comcast*, 303 F.R.D. 337, 344 (E.D. Cal. Oct. 2, 2014).

**B.    PAGA Settlements**

Under PAGA, an "aggrieved employee"[8] may bring an action for civil penalties for labor code violations on behalf of herself and other current or former employees.  Cal. Lab. Code § 2699(a).  A plaintiff suing under PAGA "does so as the proxy or agent of the state's labor law

---

[8]  An "aggrieved employee" is defined as "any person who was employed by the alleged violator and against whom one or more of the alleged violations was committed."  Cal. Lab. Code § 2699(c).

enforcement agencies." *Arias v. Superior Court*, 46 Cal. 4th 969, 986 (2009).  Accordingly, a judgment in a PAGA action "binds all those, including nonparty aggrieved employees, who would be bound by a judgment in an action brought by the government."  *Id.*; *see also Iskanian v. CLS Transp. L.A., LLC*, 59 Cal. 4th 348, 381 (2014) ("When a government agency is authorized to bring an action on behalf of an individual or in the public interest, and a private person lacks an independent legal right to bring the action, a person who is not a party but who is represented by the agency is bound by the judgment as though the person were a party.").

The PAGA statute imposes several limits on litigants.  First, because a PAGA action functions as a "substitute" for an action brought by the state government, a plaintiff suing under PAGA is limited to recovery of civil penalties only, rather than damages or unpaid wages available privately through direct or class action claims.  *Iskanian*, 59 Cal. 4th at 381; *ZB, N.A. v. Superior Court*, 8 Cal. 5th 175, 182, 193 (2019).  Second, to bring an action under PAGA, an aggrieved employee must first provide written notice to the California Labor and Workforce Development Agency ("LWDA") as well as to the employer.  Cal. Lab. Code § 2699.3(a)(1). Third, any civil penalties recovered must be divided 75% with the LWDA and 25% with the aggrieved employees.  *Id.* § 2699(i).  Finally, the proposed settlement must be submitted to the LWDA, and a trial court must "review and approve" any settlement of PAGA claims.  *Id.* § 2699(l)(2); *see also Haralson v. U.S. Aviation Servs. Corp.*, 383 F. Supp. 3d 959, 971 (N.D. Cal. 2019) (citation omitted) (noting that because settling a PAGA claim "compromises a claim that could otherwise be brought by the state," it requires that a court "review and approve any settlement of any civil action pursuant to [PAGA]").

Although there is no binding authority setting forth the proper standard of review for PAGA settlements, California district courts "have applied a Rule 23-like standard, asking whether the settlement of the PAGA claims is 'fundamentally fair, adequate, and reasonable in light of PAGA's policies and purposes.'"  *Haralson*, 383 F. Supp. 3d at 972.  This standard is derived from the LWDA.  In commenting on a proposed settlement including both class action and PAGA claims, the LWDA offered the following guidance:

/////

1
2
3
4

> It is thus important that when a PAGA claim is settled, the relief provided for under the PAGA be genuine and meaningful, consistent with the underlying purpose of the statute to benefit the public and, in the context of a class action, the court evaluate whether the settlement meets the standards of being "fundamentally fair, reasonable, and adequate" with reference to the public policies underlying the PAGA.

5   *O'Connor v. Uber Techs., Inc.*, 201 F. Supp. 3d 1110, 1133 (N.D. Cal. 2016) (citing the LWDA's

6   guidance with approval).[9]  Recognizing the distinct issues presented by class actions, this court is

7   persuaded by the LWDA's reasoning in *O'Connor* and therefore adopts its proposed standard in

8   evaluating the PAGA portion of the proposed settlement now before the court for preliminary

9   approval.  *See, e.g.*, *Castro v. Paragon Indus., Inc.*, No. 1:19-cv-00755-DAD-SKO, 2020 WL

10  1984240, at *6 (E.D. Cal. Apr. 27, 2020); *Patel v. Nike Retail Servs., Inc.*, No. 14-cv-04781-RS,

11  2019 WL 2029061, at *2 (N.D. Cal. May 8, 2019).  Accordingly, the court will approve a

12  settlement of PAGA claims upon a showing that the settlement terms (1) meet the statutory

13  requirements set forth by PAGA; and (2) are fundamentally fair, reasonable, and adequate in view

14  of PAGA's public policy goals.

15  **ANALYSIS**

16  **A.      Preliminary Class Certification**

17          The class action is a procedural mechanism whereby the "usual rule that litigation be

18  conducted by and on behalf of the named parties only" is swept aside so that multiple parties—

19  unwieldy in number but possessing similar or identical claims—may pursue common redress in

20  an efficient and economical manner.  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (citation

21  omitted).  Here, the parties seek preliminary certification of the proposed class under Federal

22  Rule of Civil Procedure 23, which governs class certification and imposes a two-step process in

23  deciding whether a class may be certified.

24  /////

25

26  [9]  In the same guidance letter, the LWDA also stated that it "is not aware of any existing case law
establishing a specific benchmark for PAGA settlements, either on their own terms or in relation
27  to the recovery on other claims in the action."  *O'Connor v. Uber Techs., Inc.*, No. 3:13-cv-
03826-EMC (N.D. Cal. Jul. 29, 2016).  A copy of the LWDA guidance letter can be located on
28  the *O'Connor* docket at Doc. No. 736 at 2–3.

11

First, Rule 23(a) requires the moving party to demonstrate the existence of four prerequisites: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy. *See Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 730 (9th Cir. 2007). Second, when a putative class satisfies these four prerequisites, it may then proceed to show it also satisfies at least one of the provisions of Rule 23(b). *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998). The party seeking class certification bears the burden of establishing conformity with this two-step process and must do so by producing facts that "affirmatively demonstrate" that class certification is warranted. *Comcast*, 569 U.S. at 33. Only after conducting a "rigorous analysis" of the produced facts and determining that they show compliance with Rule 23(a) and (b), may a district court certify a class. *Id.* at 33–34; *see also Patel*, 2016 WL 1241777, at *3 ("This 'rigorous' analysis applies both to Rule 23(a) and Rule 23(b).").

Accordingly, the court will first address the Rule 23(a) requirements followed by the requirements for a Rule 23(b)(3) certification, which plaintiff contends applies here. (Doc. No. 44-1 at 23.)

### 1. Rule 23(a) Requirements

#### a. *Numerosity*

The first Rule 23(a) requirement is that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The numerosity requirement demands "examination of the specific facts of each case and imposes no absolute limitations." *Gen. Tel. Co. of Nw., Inc. v. EEOC*, 446 U.S. 318, 330 (1980). Courts have found the requirement satisfied when the class comprises as few as thirty-nine members or where joining all class members would serve only to impose financial burdens and clog the court's docket. *See Murillo v. Pac. Gas & Elec. Co.*, 266 F.R.D. 468, 474 (E.D. Cal. 2010) (citation omitted) (discussing Ninth Circuit thresholds for numerosity and listing cases).

Here, plaintiff estimates that there are approximately 690 members in the proposed settlement class. (Doc. No. 44-1 at 21.) This showing with respect to numerosity is adequate to meet the requirements of Rule 23(a)(1).

/////

1

           b.      *Commonality*

2        The second Rule 23(a) requirement is that "there are questions of law or fact common to

3 the class." Fed. R. Civ. P. 23(a)(2). To satisfy the commonality requirement, the class

4 representatives must demonstrate that common questions of facts and law will drive or resolve the

5 litigation. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "[C]ommonality

6 requires that the class members' claims depend upon a common contention such that

7 determination of its truth or falsity will resolve an issue that is central to the validity of each claim

8 in one stroke." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012) (internal

9 quotations omitted) (quoting *Wal-Mart*, 564 U.S. at 350). "The plaintiff must demonstrate the

10 capacity of classwide proceedings to generate common answers to common questions of law or

11 fact that are apt to drive the resolution of the litigation." *Id.* For example, "[c]ommonality is

12 generally satisfied where the lawsuit challenges a system-wide practice or policy that affects all

13 of the putative class members." *Benitez v. W. Milling, LLC*, No. 1:18-cv-01484-SKO, 2020 WL

14 309200, at *5 (E.D. Cal. Jan. 21, 2020) (internal quotation marks and citations omitted).

15        The commonality requirement does not mandate that all questions of law or fact be

16 common to every single class member and "dissimilarities among class members do not

17 [necessarily] impede the generation of common answers to those questions. . . ." *Parsons v.*

18 *Ryan*, 754 F.3d 657, 675, 684 (9th Cir. 2014); *but see Wal-Mart*, 564 U.S. at 349 (citation

19 omitted) (noting that "[d]issimilarities within the proposed class . . . have the *potential* to impede

20 the generation of common answers") (emphasis added). However, merely raising any common

21 question does not suffice. *See Wal-Mart*, 564 U.S. at 349 (noting the language of Rule 23(a)(2) is

22 "easy to misread" because "[a]ny competently crafted class complaint literally raises common

23 'questions'") (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*,

24 84 N.Y.U. L. Rev. 97, 131–32 (2009)). Instead, the common question must depend upon a

25 common contention; that common contention must be answerable through a classwide

26 proceeding; and that common answer should have the potential to drive the litigation towards

27 resolution. *See id.* at 349–50.

28 /////

Here, plaintiff contends in her SAC that "[c]ommon questions of law and fact exist to all members of the Proposed Class and predominate over any questions solely affecting individual members of the Proposed Class. . . ." (Doc. No. 48 at ¶ 41.)  The SAC then lists sixteen common questions of law and fact.  (*Id.*)  In plaintiff's motion, she has summarized the common issues of fact and law as the following:

> (1) whether Defendant paid Class Members for all hours worked; (2) whether Defendant provided lawful meal periods to Class Members or premium wages in lieu thereof; (3) whether Defendant provided lawful rest periods to Class Members or premium wages in lieu thereof; (4) whether Defendant provided Class Members with accurate wage statements; (5) whether failed to pay timely and complete wages to former employees at termination in violation of California Labor Code, sections 201, 202, and 203; (6) whether Defendants kept complete and accurate payroll records as required by the California Labor Code, including *inter alia*, section 1174(d); and (7) Whether Defendants engaged in unfair business practices in violation of California Business & Professions Code section 17200, *et seq.*

(Doc. No. 44-1 at 21–22.)  Moreover, plaintiff contends that "all Class Members were subjected to the same uniform compensation practice resulting in what Plaintiff alleges is a fundamental failure to pay for all hours worked at the lawful rate." (*Id.* at 22.)  As a result, plaintiff claims that "[c]ommon evidence – timekeeping, payroll, and security alarm data – all establish common questions of fact." (*Id.*)

Because the above issues "would form the basis of each [] plaintiff's claims," the court finds that commonality is satisfied here. *Bykov v. DC Transp. Servs.*, Inc., No. 2:18-cv-01691-DB, 2019 WL 1430984, at *3 (E.D. Cal. Mar. 29, 2019) (citation omitted); *see also Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1165–66 (9th Cir. 2014) (finding that the commonality requirement was satisfied when class action claims against an employer included the common question of whether the employer had a practice or unofficial policy of requiring putative class members to work unpaid off-the-clock overtime).

          c.    *Typicality*

The third Rule 23(a) requirement is satisfied if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The typicality requirement looks to whether the claims of the class representatives are typical of

those of the class and is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (citations and internal quotation marks omitted).  The typicality requirement is a permissive standard:  "[class] representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1020.  Courts evaluate typicality by considering "whether other [class] members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (citations omitted) ("[C]lass certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation.")

Here, plaintiff contends that her claims are "essentially identical" to the putative class members.  (Doc. No. 44-1 at 22.)  "[T]he primary wage-related violation alleged" in this action is that plaintiff and putative class members were "not paid for hours worked opening Defendant's check cashing location prior to clocking-in and for closing down the locations after being required to clock out." (*Id.*)  Plaintiff's counsel elaborates in his supporting declaration that plaintiff also asserts—on behalf of herself and putative class members—violations for failure to pay meal period premiums for meal periods that were missed, cut short, or taken late, and failure to allow the appropriate number of rest breaks.  (Doc. No. 44-2 at ¶¶ 9–10.)  None of the remaining alleged violations appear unique to plaintiff, but rather are derivative from the primary off-the-clock or meal and rest period allegations.  (*See id.* at ¶¶ 8–13.)

Because the proposed class consists of employees who, like plaintiff, were employed by defendant in California and were allegedly subjected to the same wage and hour violations detailed above, the court finds that the claims brought by plaintiff are "reasonably co-extensive with those of absent class members." *Hanlon*, 150 F.3d at 1020.  Thus, typicality is satisfied.

d. *Adequacy of Representation*

The fourth and final Rule 23(a) requirement—adequacy of representation—is satisfied if "the representative parties will fairly and adequately protect the interests of the class."  Fed. R.

15

1    Civ. P. 23(a)(4).  Resolution of this issue requires the court to address the following questions:

2    "(a) do the named plaintiffs and their counsel have any conflicts of interest with other class

3    members and (b) will the named plaintiffs and their counsel prosecute the action vigorously on

4    behalf of the class?"  *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1007 (9th Cir. 2018), *cert.*

5    *dismissed*, 139 S. Ct. 1651 (2019) (citation omitted); *see also Pierce v. Cnty. of Orange*, 526 F.3d

6    1190, 1202 (9th Cir. 2008).  "Adequacy of representation also depends on the qualifications of

7    counsel."  *Sali*, 909 F.3d at 1007 (citations omitted) ("[T]he named representative's attorney

8    [must] be qualified, experienced, and generally capable to conduct the litigation. . . .").

9         Here, plaintiff maintains the adequacy of representation requirement is met because:

10   "Plaintiff has the same interests as the remaining members of the Settlement Class"; "there is no

11   conflict between the Plaintiff's claims and those of the other Class Members"; and "Plaintiff is

12   represented by experienced and competent counsel who have substantial experience in litigating

13   wage-and-hour class and representative actions."  (Doc. No. 44-1 at 23.)  As shown above,

14   plaintiff's claims are essentially identical to the putative class members thereby satisfying the

15   commonality and typicality requirements.  As a result, this also shows that that plaintiff and the

16   putative class members' interests are aligned.

17        Plaintiff's counsel's declaration filed in support of the pending motion seeks to establish

18   his firm's adequacy as class counsel.  (Doc. No. 44-2 at ¶¶ 3–6.)  According to that declaration,

19   the lead firm representing plaintiff, Advocates for Worker Rights LLP, was founded in 2018 and

20   is "dedicated to representing low wage workers in wage theft and other wage-and-hour matters."

21   (*Id.* at ¶ 3.)  Though recently formed, the firm's founders have over twenty-five years of

22   combined experience litigating class and representative actions in the context of wage and hour

23   cases.  (*Id.*)  The firm's three lawyers—Marco A. Palau, Joseph D. Sutton, and Eric S.

24   Trabucco—practiced together at Mallison & Martinez, a law firm in Oakland, California

25   specializing in class and representative actions.  (*Id.*)  The declaration lists nine class and

26   representative, wage and hour actions that the Advocates for Worker Rights LLP firm has

27   litigated as lead counsel or co-counsel since its founding.  (*Id.*)  The listed litigation matters

28   include preliminary and final approved settlement amounts ranging from $275,000.00 to

1   $2,000,000.00.  (*Id.*)  However, no such information is included in the pending motion or the

2   supporting materials regarding plaintiff's other counsel, Robert Ottinger of the Ottinger Firm,

3   P.C., for whom plaintiff seeks appointment as co-class counsel.

4        Because plaintiff represents that there are no conflicts between her claims and the putative

5   class members and that Advocates for Worker Rights LLP is experienced and vigorous counsel,

6   the court finds the adequacy of representation requirement has been satisfied.  However, absent

7   further information submitted by the parties in its motion for final approval of class action

8   settlement, the court concludes that it would have no basis upon which to appoint attorney

9   Ottinger as co-class counsel.

10        2.    Rule 23(b)(3) Requirements

11        The parties seek class certification under Rule 23(b)(3), which requires that:  (1) the

12   questions of law or fact common to class members predominate over any questions affecting only

13   individual members; and (2) a class action be superior to other available methods for fairly and

14   efficiently adjudicating the controversy.  *See Amchem*, 521 U.S. at 615; *In re Hyundai and Kia*

15   *Fuel Economy Litig.*, 926 F.3d 539, 556 (9th Cir. 2019) (*en banc*).  The test of Rule 23(b)(3) is

16   "far more demanding" than that of Rule 23(a).  *Wolin v. Jaguar Land Rover N. Am., LLC*, 617

17   F.3d 1168, 1172 (9th Cir. 2010) (quoting *Amchem*, 521 U.S. at 623–24).

18        a.    *Predominance*

19        First, Rule 23(b)(3) requires that common questions must "predominate" over any

20   individual questions.  While this requirement is like the Rule 23(a)(2) commonality requirement,

21   the standard is higher at this stage of analysis.  *Wal-Mart*, 564 U.S. at 359.  Although Rule

22   23(a)(2) can be satisfied by even a single question, Rule 23(b)(3) requires convincing proof that

23   common questions "predominate" over individual questions.  *Amchem*, 521 U.S. at 623–24.  "An

24   individual question is one where 'members of a proposed class will need to present evidence that

25   varies from member to member,' while a common question is one where 'the same evidence will

26   suffice for each member to make a prima facie showing [or] the issue is susceptible to

27   generalized, class-wide proof.'"  *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)

28   (quoting W. Rubenstein, *Newberg on Class Actions* § 4:50, pp. 196–97 (5th ed. 2012)).

17

As discussed above, plaintiff contends that here all putative class members were "subjected to the same uniform compensation practice" and that "[c]ommon evidence" resolves the common questions of fact.  (Doc. No. 44-1 at 22.)  As plaintiff's counsel elaborates in his supporting declaration, plaintiff challenges defendant's "systemic failure" in requiring off-the-clock work to open and close its store locations, allegedly resulting in unpaid wages and derivative statutory and civil penalties.  (Doc. No. 44-2 at ¶ 7.)  Moreover, plaintiff's counsel maintains that the other alleged wage and hour violations were pursuant to defendant's allegedly illegal "policy and practice."  (*Id.* at ¶¶ 8, 10.)

Class actions in which a defendant's uniform policies are challenged generally satisfy the predominance requirement of Rule 23(b)(3).  *See, e.g.*, *Castro*, 2020 WL 1984240, at *6; *Palacios v. Penny Newman Grain, Inc.*, No. 1:14-cv-01804-KJM-SAB, 2015 WL 4078135, at *5–6 (E.D. Cal. July 6, 2015); *Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1154–55 (9th Cir. 2016) (upholding predominance determination in wage and hour suit despite need for individualized damages calculations).  The court therefore concludes that the predominance requirement has been met in this case.

> b.   *Superiority*

Second, Rule 23(b)(3) also requires a court to find that "a class action is superior to other available methods for the fair adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).  To resolve the Rule 23(b)(3) superiority inquiry, "the court should consider class members' interests in pursuing separate actions individually, any litigation already in progress involving the same controversy, the desirability of concentrating in one forum, and potential difficulties in managing the class action—although the last two considerations are not relevant in the settlement context."  *See Palacios*, 2015 WL 4078135, at *6 (citing *Schiller v. David's Bridal Inc.*, No. 10-cv-00616-AWI-SKO, 2012 WL 2117001, at *10 (E.D. Cal. June 11, 2012)).

Here, plaintiff contends in her motion for preliminary approval that superiority is satisfied because "[t]here is no other mechanism by which all of the putative Settlement Class members' claims will be as fairly, adequately, and efficiently resolved as through a class action."  (Doc. No. 44-1 at 23.)  Plaintiff contends that employing a class action here will "achieve economies of

1   scale for the Settlement Class"; "conserve the resources of the judicial system"; "preserve public

2   confidence in the integrity of the system by avoiding the waste and delay of repetitive

3   proceedings"; and "prevent the inconsistent adjudications of similar issues and claims." (*Id.*) In a

4   case like this one, plaintiff contends, "the alternative to a class [action] case is often no case at all

5   due to employees' understandable fear of retaliation." (*Id.* at 23–24.)

6          The court also finds another reason supporting the superiority of a class action device.

7   Because the parties agree that the "overwhelming[] majority" of the putative class members are

8   "bound by arbitration agreements," (Doc. No. 44-1 at 9), it may be cost prohibitive for putative

9   class members to pursue wage claims on an individual basis. *See Leyva v. Medline Indus. Inc.*,

10  716 F.3d 510, 514 (9th Cir. 2013) (finding superiority satisfied in wage and hour lawsuit when it

11  might "be the only feasible means" to adjudicate class claims under $10,000); *see also Amchem*,

12  521 U.S. at 617 (citation omitted) ("The policy at the very core of the class action mechanism is

13  to overcome the problem that small recoveries do not provide the incentive for any individual to

14  bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating

15  the relatively paltry potential recoveries into something worth someone's (usually an attorney's)

16  labor."). Even if a putative class member did wish to pursue an individual action, Rule 23(b)(3)

17  allows class members to opt out and seek such individual relief. Fed. R. Civ. P. 23(c)(2)(B)(v).

18  As plaintiff explains in her pending motion, the putative class already "exclude[es] any

19  individuals who already resolved the claims asserted in the Action, whether by settlement or

20  adjudication, or any of the thirty-three (33) individuals who have filed, or were prepared to file by

21  and through Class Counsel, demands for individual arbitration." (Doc. No. 44-1 at 6.)

22         Given that "[a] common nucleus of facts and potential legal remedies" predominate, the

23  court finds that these questions can be resolved for all members more efficiently and

24  expeditiously in a single action. *Hanlon*, 150 F.3d at 1022. Therefore, the court is satisfied that

25  the superiority requirement has been met here.

26         Accordingly, for all the forgoing reasons the requirements for preliminary certification

27  under Rule 23 have been satisfied, and the court finds that conditional certification of the

28  settlement class is appropriate.

1   **B.     Preliminary Settlement Approval**

2            Plaintiff also seeks preliminary approval of the proposed settlement.  Under Rule 23(e), a

3   court may approve a proposed class action settlement only if it is a fair, reasonable, and adequate

4   resolution of the dispute.  Fed. R. Civ. P. 23(e)(2); *Bluetooth*, 654 F.3d at 946.  Preliminary

5   approval is appropriate when "the court will likely be able to" give final approval under Rule

6   23(e)(2).  As such, "preliminary approval of a settlement has both a procedural and substantive

7   component" and is appropriate if:  (1) the proposed settlement appears to be the product of

8   serious, informed, non-collusive negotiations; and (2) the settlement falls within the range of

9   possible approval, has no obvious deficiencies, and does not improperly grant preferential

10  treatment to class representatives or segments of the class.  *Tableware Antitrust Litig.*, 484 F.

11  Supp. 2d at 1079 (citation omitted); *see also* Fed. R. Civ. P. 23(e)(1)(B).  Because the proposed

12  settlement has a PAGA component, it must also meet the statutory requirements under that act

13  and be fundamentally fair, reasonable, and adequate in view of PAGA's public policy goals.

14           1.      The PAGA Component

15           PAGA requires that a proposed settlement be submitted to the LWDA.  Cal Lab. Code §

16  2699(l)(2); *see also Haralson*, 383 F. Supp. 3d at 971 (citation omitted) (noting that a proposed

17  settlement should be submitted to the LWDA to allow it to comment if it so desires).  Here,

18  plaintiff claims that her counsel "electronically submitted the proposed Settlement to the LWDA

19  on June 9, 2021." (Doc. No. 44-1 at 10 n.3.)  Thus, the court finds this requirement satisfied and

20  will address the fairness, reasonableness, and adequacy of the PAGA penalties below.

21           2.      Procedural Fairness

22           Procedural fairness is based on whether "the class representatives and class counsel have

23  adequately represented the class." Fed. R. Civ. P. 23(2)(A).  The court must also consider

24  whether the process by which the parties arrived at the settlement is the product of arm's-length

25  bargaining, rather than collusion or fraud.  Fed. R. Civ. P. 23(2)(B); *Millan v. Cascade Water

26  Servs., Inc.*, 310 F.R.D. 593, 613 (E.D. Cal. 2015).  A settlement is presumed fair if it "follow[s]

27  sufficient discovery and genuine arm's-length negotiation." *Adoma v. Univ. of Phx., Inc.*, 913 F.

28  Supp. 2d 964, 977 (E.D. Cal. 2012) (citation omitted).  "Participation in mediation 'tends to

                                            20

1   support the conclusion that the settlement process was not collusive.'" *Palacios*, 2015 WL

2   4078135, at *8 (citation omitted).

3          Here, after two years of litigation, the parties agreed to mediation with mediator Ross on

4   January 25, 2021, during which they successfully reached a settlement.  (Doc. No. 44-1 at 9.)

5   According to plaintiff, the mediator "was thoroughly apprised of the arguments and facts of this

6   case by means of extensive briefing and factual presentations by both Plaintiff and Defendant."

7   (*Id.*)  The material terms of the proposed settlement before the court were the result of Jeff Ross's

8   mediator proposal, which was accepted by both parties in the days following the parties'

9   mediation.  (*Id.*)  In reaching the settlement, plaintiff also maintains that both parties relied on

10  their counsel's "substantial litigation experiences in similar class and PAGA actions, and the

11  analyses prepared by their respective experts."  (*Id.*)

12         In the lead up to the mediation, plaintiff successfully moved to compel further discovery

13  responses from defendant.  (Doc. No. 34.)  Defendant ultimately produced more than 45,000

14  pages of documents and data covering class members timekeeping, payroll, and contact

15  information, and security alarm data for its stores.  (Doc. No. 44-1 at 16–17.)  In plaintiff's

16  pending motion, she asserts that this information allowed her counsel to "fairly evaluate the

17  strengths of the case and the risks associated with ongoing litigation." (*Id.* at 15–16.)  In

18  particular, through a comparison of defendant's security alarm data from their 191 store locations

19  and the class members' timekeeping records, plaintiff represents that her counsel determined how

20  much time elapsed from when employees disarmed the security systems upon entering

21  defendant's store location to when employees first clocked in.  (*Id.* at 17.)  The same comparison

22  was made for when employees clocked out to when the security alarm was armed before exiting

23  the store.  (*Id.*)  This comparison addressed plaintiff's core allegation that off-the-clock work was

24  required by putative class members to open and close defendant's stores.  (*Id.* at 22.)  Plaintiff's

25  counsel also "evaluated data regarding meal and rest break" and "evaluated the strengths and

26  weaknesses relating to those claims."  (*Id.* at 17.)  Another factor plaintiff considered was the

27  potential recovery by the workers when "nearly all [putative class members] were subject to

28  binding arbitration agreements including class action waivers."  (*Id.*)  In sum, plaintiff's counsel

1    represents that the proposed settlement "is the product of non-collusive negotiations" and that all

2    of the above factors weigh in favor of preliminary approval.  (*Id.*)

3         Based on these representations by the parties, the court concludes preliminarily that the

4    parties' negotiation constituted genuine, informed, and arm's-length bargaining.

5         3.    <u>Substantive Fairness</u>

6              a.    *Adequacy of the Settlement Amount*

7         To evaluate substantive fairness of a proposed settlement the court should "compare the

8    terms of the compromise with the likely rewards of litigation."  *Campbell v. Facebook, Inc.*, 951

9    F.3d 1106, 1123 (9th Cir. 2020) (citation omitted); *see also* Fed. R. Civ. P 23(e)(2)(C)-(D).  "It is

10   well-settled law that a cash settlement amounting to only a fraction of the potential recovery does

11   not *per se* render the settlement inadequate or unfair."  *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d

12   454, 459 (9th Cir. 2000), *as amended* (June 19, 2000) (citation omitted).  To determine whether a

13   settlement "falls within the range of possible approval," a court must focus on "substantive

14   fairness and adequacy" and "consider plaintiffs' expected recovery balanced against the value of

15   the settlement offer."  *Tableware Antitrust Litig.*, 484 F. Supp. 2d at 1080.

16        Here, the parties have agreed to a $1,250,000.00 gross settlement amount.  (Doc. No. 44-1

17   at 18.)  Assuming the various allocations described earlier in this order are awarded in full, the net

18   settlement amount will be $717,833.75.  (*Id.*)  The entire net settlement amount will be distributed

19   to the class members on a proportional and non-reversionary basis, with any uncashed funds at or

20   above $10,000.00 to be distributed to each class member who cashed their individual settlement

21   amount.  (*Id.* at 13, 18.)  If the total uncashed checks amount to less than $10,000.00, the balance

22   will be donated to California Rural Legal Assistance.  (*Id.* at 13.)

23   /////

24   /////

25   /////

26   /////

27   /////

28   /////

1    Plaintiff has estimated that the total value of the PAGA claim, including its predicate

2    California Labor Code violations, was approximately $11,697,600.00.[10]  (Doc. No. 44-1 at 18.)

3    The gross settlement amount of $1,250,000.00 thus represents an approximately eleven percent

4    recovery of the theoretical maximum of $11,697,600.00.  (*Id.* at 18–19.)  This settlement amount

5    is within the range of the percentage recoveries that California district courts—including this

6    one—have found to be reasonable.  *See, e.g.*, *Singh v. Roadrunner Intermodal Servs., LLC*, No.

7    1:15-cv-01497-DAD-BAM, 2018 WL 2412325, at *7 (E.D. Cal. May 29, 2018), *modified*, No.

8    1:15-cv-01497-DAD-BAM, 2018 WL 4382202 (E.D. Cal. Sept. 13, 2018) (approving a

9    settlement of about 12% of the estimated maximum damages); *In re Toys R Us-Delaware, Inc.-*

10   *Fair & Accurate Credit Transactions Act (FACTA) Litig.*, 295 F.R.D. 438, 454 (C.D. Cal. 2014)

11   (approving a settlement of about 5–30% of the estimated maximum); *In re Omnivision Techs.,*

12   *Inc.*, 559 F. Supp. 2d 1036, 1042 (N.D. Cal. 2008) (approving a settlement of about 9% of the

13   estimated maximum).  The recovery is also allocated so that class members will receive awards

14   proportional to the number of pay periods that they worked.  (Doc. No. 44-1 at 11.)

15       Plaintiff asserts that the proposed settlement's 11% recovery rate is fair, reasonable,

16   adequate, and "in the best interest of the putative class members in light of all known facts and

17   circumstances."  (Doc. No. 44-1 at 19.)  Plaintiff points to three reasons supporting this

18   conclusion.  (*Id.* at 18–20.)  First, plaintiff asserts that her counsel conducted a thorough

19   investigation into class members' claims against defendant, including a review and analysis of

20   defendant's production of payroll, timekeeping, and security alarm records.  (*Id.* at 19.)  This

21   investigation, review, and analysis resulted in plaintiff's calculated maximum recovery of

22   $11,697,600.00 for plaintiff's PAGA claim.  (*Id.* at 18.)  However, plaintiff also cautions that

23   ---

24   [10]   When the parties entered the mediation, the class allegations in the first amended complaint
had been dismissed pursuant to an order issued by the undersigned.  (Doc. No. 41.)  Thus, the

25   focus of the mediation was on the value of the PAGA claim.  In plaintiff's counsel's declaration,
he states that the proposed settlement before the court "was premised on the understanding that

26   Plaintiff would amend the operative complaint to re-plead the class allegations previously
dismissed for the Class Period. . . .  This was done in order to maximize the monetary recovery

27   for the 690 workers who fell within the PAGA period (February 25, 2018 to December 31, 2020)
and to afford Defendant with class-wide relief."  (Doc. No. 44-2 at ¶ 21.)  After filing her motion

28   for preliminary approval, plaintiff filed the SAC re-pleading the class allegations.  (Doc. No. 48.)

23

1    portions of the PAGA claims are "less certain," such as recovering the $3,551,400 portion of

2    PAGA penalties for the alleged rest break violations.  (*Id.* at 18–20.)  The rest break claim

3    purportedly "presents significant [evidentiary] challenges" because existing law does not require

4    employers to record rest periods, so the alleged violations would rest solely on testimony and

5    would not be supported by any documentary proof.  (*Id.* at 19–20.)  As such, plaintiff's counsel

6    contends these evidentiary challenges "make trial a risk . . . [and] increase the likelihood of

7    appeals."  (*Id.* at 20.)

8        Second, as with all PAGA claims, penalties awarded are subject to discretionary

9    reductions from the trial court.  *See* Cal. Lab. Code § 2699(e)(2).  Thus, plaintiff's counsel

10    contends that even if plaintiff was successful at trial, there could be a substantial reduction in the

11    maximum penalty amount of recovery.  (Doc. No. 44-1 at 18.)

12        Third, plaintiff contends that there is a "risk of significant delay" weighing in favor of

13    approving the proposed settlement as fair, reasonable, and adequate.  (*Id.* at 19.)  Plaintiff's

14    counsel expands on this point in his supporting declaration, explaining that the time needed to

15    litigate the case to completion would "delay payments to the workers who were systemically

16    cheated out of small amounts of compensable time spent opening and closing Defendant's

17    stores."  (Doc. No. 44-2 at ¶ 37.)

18        Finally, the court has two observations of its own supporting the fairness and adequacy of

19    the settlement.  First, under PAGA, only 25% of the total maximum recovery calculated would be

20    allocated to all the aggrieved employees during the PAGA period, which in this case, amounts to

21    $2,924,400.00 ($11,697,600.00 multiplied by 0.25).  *See Moorer v. Noble L.A. Events, Inc.*, 32

22    Cal. App. 5th 736, 742 (2019) (rejecting plaintiff's argument that the 25% of civil penalties

23    should go entirely to the aggrieved employee who brings the PAGA suit; "[a]llocation of 25

24    percent to *all* aggrieved employees is consistent with the statutory scheme") (emphasis added),

25    *review denied* (May 15, 2019).  Viewed from this perspective, the percentage of recovery would

26    amount to approximately 43% ($1,250,000.00 divided by $2,924,400.00), making the results well

27    within the range of a reasonable recovery.

28    /////

24

Second, the amount that the average putative class member can expect to receive under the proposed settlement is $1,040.33.  (Doc. No. 44-1 at 18.)  This is significant given that plaintiff's alleged rate of pay in the SAC was approximately $25.10 per hour after ten years of employment and serving in the capacity of a store manager.  (Doc. No. 48 at ¶ 6); *see Gonzalez v. CoreCivic of Tenn., LLC*, No. 1:16-cv-01891-DAD-JLT, 2020 WL 1475991, at *11 (E.D. Cal. Mar. 26, 2020) (noting that an average settlement award of $3,000.00 is significant for employees who typically earn $15.00–30.00 an hour).

Although "a larger award was theoretically possible, 'the very essence of a settlement is compromise, a yielding of absolutes and an abandoning of highest hopes.'"  *Barbosa v. Cargill Meat Sols. Corp.*, 297 F.R.D. 431, 447 (E.D. Cal. 2013) (citing *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998) (internal citations and quotation marks omitted)).

Here, the court finds the rate of recovery in line with other class action settlements it has approved, and thus, the amount is preliminary approved as fair, reasonable, and adequate.

b.   *PAGA Penalties*

The proposed settlement also provides for $100,000.00 in civil PAGA penalties.  (Doc. No. 44-1 at 10.)  Under PAGA, 75% of the civil PAGA penalties, or $75,000.00, will go to the LWDA, and 25%, or $25,000, will be included in the net settlement amount.  (*Id.*); *see also* Cal. Lab. Code § 2699(i).

Here, plaintiff's counsel explained in his declaration supporting the pending motion that the estimated $11,697,600.00 in total potential PAGA exposure was "calculated for mediation purposes" and does not "weigh[] for the relative strengths and weaknesses of specific claims." (Doc. No. 44-2 at ¶ 34.)  Specifically, the total potential PAGA exposure does not consider a trial court's discretion to reduce a civil penalties award, California Labor Code § 2699(e)(2), or the purported evidentiary problems with plaintiff's rest break violation claim which makes up $3,551,400.00 or 30% of the total potential PAGA exposure.  (*Id.* at ¶ 37.)

The resulting $100,000.00 allocated towards civil penalties represents 8% of the $1,250,000.00 gross settlement amount.  The amount proposed to settle plaintiff's PAGA claims is proportionally consistent with other PAGA settlements approved by this court.  *See, e.g.*,

1    *Castro*, 2020 WL 1984240, at *15 (approving $75,000.00 in PAGA penalties for a California

2    class with a $3,750,000.00 gross settlement fund); *Syed v. M-I, LLC*, No. 1:12-cv-01718-DAD-

3    MJS, 2017 WL 714367, at *13 (E.D. Cal. Feb. 22, 2017) (approving $100,000.00 in PAGA

4    penalties for a California class with a $3,950,000.00 gross settlement fund).  The court therefore

5    preliminarily concludes that the settlement of plaintiff's PAGA claims is fair, reasonable, and

6    adequate considering PAGA's public policy goals.  *See O'Connor*, 201 F. Supp. 3d at 1133.

7                c.    *Attorneys' Fees*

8         When a negotiated class action settlement includes an award of attorneys' fees, the district

9    court "ha[s] an independent obligation to ensure that the award, like the settlement itself, is

10    reasonable, even if the parties have already agreed to an amount."  *Bluetooth*, 654 F.3d at 941; *see*

11    *also Knisley v. Network Assocs., Inc.*, 312 F.3d 1123, 1125 (9th Cir. 2002) (citation omitted).

12    Where, as here, fees are to be paid from a common fund, the relationship between the class

13    members and class counsel "turns adversarial."  *In re Mercury Interactive Corp. Sec. Litig.*, 618

14    F.3d 988, 994 (9th Cir. 2010) (citation omitted).  As a result, the district court must assume a

15    fiduciary role for the class members and "act with 'a jealous regard to the rights of those who are

16    interested in the fund' in determining what a proper fee award is."  *Id.* (internal quotation marks

17    and citations omitted).

18         When evaluating attorneys' fees award, "courts have discretion to employ either the

19    lodestar method or the percentage-of-recovery method."  *Bluetooth*, 654 F.3d at 942.  Under

20    either approach, "[r]easonableness is the goal, and mechanical or formulaic application of either

21    method, where it yields an unreasonable result, can be an abuse of discretion."  *Fischel v.*

22    *Equitable Life Assurance Soc'y of U.S.*, 307 F.3d 997, 1007 (9th Cir. 2002).

23         Under the percentage-of-recovery method, the court may award class counsel a percentage

24    of the common fund recovered for the class; in the Ninth Circuit, the benchmark is 25%.  *See id.*

25    at 1007, 1047–48; *Bluetooth*, 654 F.3d at 942.  Special circumstances that could justify varying

26    the benchmark award include when counsel achieves exceptional results for the class, undertakes

27    extremely risky litigation, generates benefits for the class beyond simply the cash settlement fund,

28    or handles the case on a contingency basis.  *See In re Online DVD-Rental Antitrust Litig.*, 779

F.3d 934, 954–55 (9th Cir. 2015).  An explanation is necessary when the court departs from the 25% benchmark, *Powers v. Eichen*, 229 F.3d 1249, 1256–57 (9th Cir. 2000), but either way, "[s]election of the benchmark or any other rate must be supported by findings that take into account all of the circumstances of the case."  *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048 (9th Cir. 2002).

With the lodestar method, the court multiples the number of hours the prevailing party reasonably spent litigating the case by a reasonable hourly rate for counsel.  *Bluetooth*, 654 F.3d at 941.  The product of this computation—the "lodestar" amount—yields a presumptively reasonable fee.  *See Gonzalez v. City of Maywood*, 729 F.3d 1196, 1202 (9th Cir. 2013). The Ninth Circuit has recommended that district courts apply one method but cross-check the appropriateness of the determined amount by employing the other.  *See Bluetooth*, 654 F.3d at 944.  This diligence is particularly important "when counting *all* hours expended" in a case "where the plaintiff has achieved only limited success" would yield an "excessive amount" of fees, or when awarding a percentage of a "megafund would yield windfall profits for class counsel in light of the hours spent on the case."  *Bluetooth*, 654 F.3d at 942 ("Just as the lodestar method can confirm that a percentage of recovery amount does not award counsel an exorbitant hourly rate, the percentage-of-recovery method can likewise be used to assure that counsel's fee does not dwarf class recovery.") (internal quotation marks and citations omitted).  Similarly, an upward adjustment could be justified if the recovery is "too small . . . in light of the hours devoted to the case or other relevant factors."  *Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990).

Here, the settlement agreement provides that class counsel will seek an award of $416,666.25, equivalent to 33.33% of the gross settlement amount.  (Doc. No. 54-1 at 9.)  That amount is higher than the 25% benchmark established in the Ninth Circuit, *Bluetooth*, 654 F.3d at 942, but not uncommon for wage and hour class actions litigated in the Eastern District of California.  *See Barbosa*, 297 F.R.D. at 450 (listing cases where courts approved attorneys' fees of approximately one-third of the total settlement).  The proposed settlement agreement also provides for an additional award of $20,000.00, (Doc. No. 54-1 at 9), which plaintiff claims are

1   for her counsel's expenses incurred in litigating the case, preparing for mediation, conducting a

2   damages analysis, working on the settlement approval, and "related tasks."  (Doc. No. 44-1 at 10.)

3          Plaintiff's counsel does not provide any explanation for the proposed departure from the

4   25% benchmark.  However, considering that the relief obtained for class members, including the

5   fact that many class members are bound by arbitration agreements and class action waivers, (Doc.

6   No. 44-1 at 17), the court accepts a measured departure from the benchmark at this preliminary

7   approval stage of the litigation.  At the final approval stage, however, the court will carefully re-

8   examine the award of attorneys' fees and conduct a final lodestar cross-check.  At that point, the

9   court will expect plaintiffs' counsel to provide the requisite billing records and calculations

10  justifying its fees.[11]  *See Fischel*, 307 F.3d at 1006–07 & n.7, 1008 (noting that a district court has

11  discretion to adjust a lodestar upward or downward, including via a multiplier, based on certain

12  reasonableness factors); *Bluetooth*, 654 F.3d at 941–42 (same).  Additionally, plaintiff's counsel

13  must provide an accounting or invoices documenting the requested $20,000.00 in litigation

14  expenses at the final approval stage.

15              d.    *Incentive Payment*

16          While incentive awards are "fairly typical in class action cases," they are discretionary

17  sums awarded by the court "to compensate class representatives for work done on behalf of the

18  class, to make up for financial or reputational risk undertaken in bringing the action, and,

19  sometimes, to recognize their willingness to act as a private attorney general."  *Rodriguez v. W.*

20  *Publ'g Corp.*, 563 F.3d 948, 958–59 (9th Cir. 2009); *see also Staton v. Boeing Co.*, 327 F.3d 938,

21  977 (9th Cir. 2003) ("[N]amed plaintiffs . . . are eligible for reasonable incentive payments.").

22  Incentive payments are to be evaluated individually, and the court should look to factors such as,

23  "the actions the plaintiff has taken to protect the interests of the class, the degree to which the

24  class has benefitted from those actions . . . the amount of time and effort the plaintiff expended in

25  pursuing the litigation . . . and reasonabl[e] fear[s of] workplace retaliation."  *Staton*, 327 F.3d

26

27  [11]  "Though the court may well grant an award of that size under certain circumstances, the court
    cannot abdicate its obligation to protect the rights of absent members by simply defaulting to the
    method [of determining attorneys' fees] proffered by plaintiffs."  *Perez v. All Ag, Inc.*, No. 1:18-

28  cv-00927-DAD-EPG, 2020 WL 1904825, at *9 (E.D. Cal. Apr. 17, 2020).

1    at 977 (citation omitted).

2         Here, plaintiff Alicia Arredondo requests an incentive payment of $10,000.00.  (Doc. No.

3    44-1 at 10.)  In plaintiff's counsel's declaration filed in support of the pending motion, he

4    included the following information about plaintiff:

5              Named Plaintiff Alicia Arredondo devoted significant time and
               effort to prosecuting the claims asserted in the operative complaint,
6              including gathering, organizing, and reviewing documents essential
               to the case, reaching out to witnesses, and assisting counsel with
7              investigating the case.  Plaintiff's counsel will submit a declaration
               from the proposed Class Representative at Final Approval in
8              support of her proposed enhancement award detailing her
               participation in the action, including specifics of actions taken, time
9              committed, and risks faced.

10   (Doc. No. 44-2 at ¶ 39.)  Plaintiff's incentive payment would be in addition to her individual

11   settlement payment.  (*Id.* at ¶ 23.)  Under the proposed settlement, the average putative class

12   member will receive $1,040.33.  (*Id.* ¶ 38.)  Thus, an incentive award of $10,000.00 would be

13   over nine and one-half times the average amount each putative class member could expect to

14   receive from the proposed settlement.  Though this figure is not necessarily excessive, *see, e.g.*,

15   *Aguilar v. Wawona Frozen Foods*, No. 1:15-cv-00093-DAD-EPG, 2017 WL 2214936, at *8

16   (E.D. Cal. May 19, 2017) (approving an incentive award of $7,500 to each class representative

17   where average class recovery was approximately $500), the Ninth Circuit has repeatedly urged

18   district courts to be "vigilant in scrutinizing all incentive awards to determine whether they

19   destroy the adequacy of the class representatives."  *Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d

20   1157, 1163 (9th Cir. 2013) (citation omitted); *see also In re Online DVD-Rental Antitrust Litig.*,

21   779 F.3d at 941–43 (upholding district court's determination that awarding $5,000 each to nine

22   class representatives was appropriate even though objectors argued it was significantly larger than

23   the $12 each unnamed class member would receive).

24   /////

25   /////

26   /////

27   /////

28   /////

Having reviewed the proposed $10,000.00 incentive award, the court notes that the amount requested may be disproportionately high given the possible disparity with the proposed settlement's average or median award.[12]  Although the court will preliminarily approve the incentive award in the amount sought, plaintiff must demonstrate at the final approval stage that the requested award is commensurate with and does not inappropriately dwarf the awards to be received by the putative class members.

e.    *Release of Claims*

The release quoted in this order was revised by the parties at the court's direction.  (Doc. Nos. 49, 51.)  The parties revised the release due to overbreadth issues that the court identified.  (Doc. No. 49 at 2.)  More specifically, the original release included claims that were not litigated in this action, such as claims under the implementing regulations for the Fair Labor Standards Act ("FLSA") and claims for expense reimbursement and suitable seating.  (*Id.*)  The parties ultimately omitted those un-litigated claims from the release in their revised settlement agreement.  (Doc. No. 50 at 2.)  After addressing additional typographical errors concerning the release and signature, (Doc. Nos. 51, 52, 54), the court has reviewed the release included in the parties' third revised settlement agreement.  (Doc. No. 54-1 at 2–3, 16.)  The court concludes that the released claims appropriately track the claims litigated in this action and that the terms governing the release are consistent with applicable caselaw.

**C.    Proposed Class Notice and Administration**

For proposed settlements under Rule 23, "the court must direct notice in a reasonable manner to all class members who would be bound by the proposal."  Fed. R. Civ. P. 23(e)(1); *see also Hanlon*, 150 F.3d at 1025 ("Adequate notice is critical to court approval of a class settlement under Rule 23(e).").  For a class certified under Federal Rule of Civil Procedure 23(b)(3), the notice must contain, in plain and clear language:  (1) the nature of the action; (2) the definition of the class certified; (3) the class claims, issues, or defenses; (4) the right of a class member to

---

[12]  Plaintiff has provided the court with the average award expected from the proposed settlement, but she has not provided estimates regarding the expected median, minimum, or maximum awards.  Plaintiff is directed to provide this information in her motion for final approval of the class action settlement.

1    appear through an attorney, if desired; (5) the right to be excluded from the settlement; (6) the

2    time and manner for requesting an exclusion; and (7) the binding effect of a class judgment on

3    members of the class.  Fed. R. Civ. P. 23(c)(2)(B).  A class action settlement notice "is

4    satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those

5    with adverse viewpoints to investigate and to come forward and be heard."  *Churchill Vill., LLC*

6    *v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) (internal quotation marks and citations omitted).

7            Here, the settlement agreement provides that following the court's preliminary approval,

8    defendant will provide Phoenix with information containing each class member's "name,

9    employee identification number, last known address, [] Social Security number, the start date and

10   end date for each Class Member's employment as applicable, and the number of pay periods the

11   Class Member worked during the Class Period."  (Doc. No. 54-1 at 11.)  Phoenix will then mail

12   the class notice packet, (Doc. No. 52-2), to each class member using first-class mail.  (Doc. No.

13   54-1 at 11.)  If any class notice packets are returned due to an incorrect address, Phoenix must

14   promptly "search for a more current address for the Class Member using Accurint and other

15   reasonable and cost-effective skip trace methods, and re-mail the Class Notice Packet."  (*Id.*)

16   Phoenix must also use class member's data to find a more current address and take other

17   reasonable steps to ensure delivery of undelivered class notice packets, including:  tracking all

18   undelivered mail; performing address searches for all mail returned without a forwarding address;

19   and promptly re-mailing when new addresses are found.  (*Id.*)  On a weekly basis, Phoenix must

20   send class counsel and defendant's counsel updates showing any returned and re-mailed packets

21   and any received notices from class members requesting to be excluded from the settlement, any

22   valid and timely written objections to the settlement, or challenges to the number of pay periods

23   noted in the class member's class notice packet.  (*Id.* at 11–12.)  Finally, 28 calendar days before

24   the final approval hearing, Phoenix will serve on all parties and file with this court a declaration

25   of its due diligence setting forth its compliance with the settlement agreement.  (*Id.* at 12.)

26           Plaintiff contends that the class notice packet is "the best notice practicable" because it

27   "adequately informs Class Members of the nature of the litigation, the essential terms of the

28   Settlement, how to object to, comment on, or request exclusion from the Settlement."  (Doc. No.

44-1 at 24.)  A review of the class notice packet confirms it provides adequate information about the nature of the litigation, the essential terms of the settlement, how a class member would object to the settlement, or how a class member would request to be excluded from the settlement. (Doc. No. 52-2 at 2, 4, 7–8.)  The class notice packet also identifies the class counsel; specifies the amounts that will be sought for the plaintiff's incentive payment and class counsel's fees and expenses; and explains how to obtain additional information, including a link to a website.  (*Id.* at 7, 9.)  The class notice packet adequately informs the class members of the scope of the claims that are being released by including a copy of the release in the notice itself and by providing a page citation in the settlement agreement where the class members can view the release in the context of the settlement agreement.  (*Id.* at 6–7.)

The court finds that the notice and the manner of notice proposed by plaintiff meet the requirements of Federal Civil Procedure Rule 23(c)(2)(B), and that the proposed mail delivery is appropriate under these circumstances.

**D.      Settlement Administrator and Settlement Administration Costs**

The parties have agreed to retain Phoenix Class Action Administration Solutions ("Phoenix") to handle the notice and claim administration process and request that Phoenix be appointed to serve as the settlement administrator.  (Doc. No. 44-1 at 25.)

The estimated cost of administering this settlement is $10,500.00, which will be deducted from the gross settlement amount.  (Doc. Nos. 44-1 at 25–26; 44-5.)  This estimate is proportionally consistent with other settlements approved by this court.  *See, e.g.*, *Gonzalez*, 2020 WL 1475991, at *14 (administration costs of $15,000.00 for a $3.2 million settlement); *Dakota Med., Inc. v. RehabCare Grp., Inc.*, No. 1:14-cv-02081-DAD-BAM, 2017 WL 1398816, at *5 (E.D. Cal. Apr. 19, 2017) (administration costs of $94,000.00 for a $25 million settlement); *Aguilar*, 2017 WL 117789, at *7 (administration costs of $45,000.00 for a $4.5 million settlement).

Accordingly, the court will appoint Phoenix as the settlement administrator.

/////

/////

32

**E.      Implementation Schedule**

The court sets the following implementation schedule, which is based on the proposal submitted by plaintiff's counsel (Doc. No. 44-1 at 26):

| Event | Date |
|---|---|
| Deadline for defendant to provide Phoenix with a spreadsheet containing Class Member contact information and data necessary to calculate settlement shares | No later than 14 days after entry of this order granting preliminary approval |
| Deadline for Phoenix to mail Notice Packets to all Class Members | No later than 14 days after Phoenix receives Class Member contact information and settlement share data from the defendant |
| Deadline for Class Members to Challenge Weeks Worked information | No later than 45 days after Phoenix mails the Notice Packets to all Class Members |
| Deadline for Class Members to file with the Court and send to Phoenix any objections regarding the Settlement | No later than 45 days after Phoenix mails the Notice Packets to all Class Members |
| Deadline for Class Members to Request Exclusion from the Settlement | No later than 45 days after Phoenix mails the Notice Packets to all Class Members |
| Deadline to compile and submit to the parties a list of all Class Members who submitted timely and valid Requests for Exclusion, Objections, or disputed the number of pay periods worked from the Settlement | No later than 5 days after the deadline for Class Members to submit a Request for Exclusion |
| Final Approval Hearing | May 16, 2022 |

In addition to the dates identified in this implementation schedule, the parties and Phoenix are instructed to follow the remaining dates and time restrictions identified in the settlement agreement (Doc. No. 54-1).

**CONCLUSION**

Accordingly:

1.      Plaintiff's motion for preliminary approval of class action settlement (Doc. No. 44) is granted;

33

2.    The proposed class identified in the settlement agreement (Doc. No. 54-1) is certified for settlement purposes;

3.    Plaintiff's counsel, Joseph D. Sutton, Marco A. Palau, and Eric S. Trabucco of the Advocates for Worker Rights LLP firm, are appointed as class counsel for settlement purposes;

4.    The named plaintiff, Alicia Arredondo, is appointed as class representative for settlement purposes;

5.    Phoenix Class Action Administration Solutions is approved as the settlement administrator;

6.    The proposed class notice (Doc. No. 52-2) is approved in accordance with Federal Rule of Civil Procedure 23;

7.    Before sending out the class notice, the court directs the parties or Phoenix to:

    a.    fill in all blank or bracketed placeholders in the class notice with the appropriate dates;

    b.    delete all references to the Ottinger Law Firm (Doc. No. 52-2 at 7, 9);

    c.    revise the reference to Magistrate Judge Oberto to Judge Drozd (Doc. No. 52-2 at 8); and

    d.    revise the reference to courtroom 7 to courtroom 5 (Doc. No. 52-2 at 8).

8.    The proposed settlement detailed herein is approved on a preliminary basis as fair and adequate;

9.    The hearing for final approval of the proposed settlement is set for Monday, May 16, 2022 at 2:30 p.m. before the undersigned in courtroom 5, with the motion for final approval of class action settlement to be filed at least 28 days in advance of the final approval hearing, in accordance with Local Rule 230(b);

    a.    Among other things the parties deem appropriate, the parties are directed to provide the court with the information requested in footnote 12 with their motion for final approval of class action settlement;

//////

10.     The settlement implementation schedule set forth above as modified by the court is adopted; and

11.     The parties are directed to file a declaration with the court confirming that all notices pursuant to 28 U.S.C. § 1715 were served by December 24, 2021, as asserted in defendant counsel's declaration (Doc. No. 53 at ¶ 3).

IT IS SO ORDERED.

Dated:   __**February 9, 2022**__                    _____
                                                                    UNITED STATES DISTRICT JUDGE