1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                        FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   ALICIA ARREDONDO,                          No.  1:18-cv-01737-DAD-SKO

12                   Plaintiff,

13        v.                                     ORDER GRANTING FINAL APPROVAL OF
                                                 CLASS ACTION SETTLEMENT AND
14   SOUTHWESTERN & PACIFIC                      AWARDING ATTORNEYS' FEES, COSTS,
     SPECIALTY FINANCE, INC.,                    AND INCENTIVE AWARD
15
                     Defendant.                  (Doc. No. 56)
16

17

18        This matter came before the court on May 16, 2022 for a hearing on plaintiff Alicia

19   Arredondo's unopposed motion for final approval of a class action settlement, an award of

20   attorneys' fees and litigation costs, and an incentive award for plaintiff.  (Doc. No. 56.)  Attorney

21   Joseph Sutton appeared by video on behalf of plaintiff and the settlement class.  Attorney

22   Amanda Beckwith appeared by video on behalf of defendant Southwestern & Pacific Specialty

23   Finance, Inc.  For the reasons set forth below, the court will grant final approval of the class

24   action settlement and will award attorneys' fees, costs, and an incentive award.

25                                    **BACKGROUND**

26        The court previously granted plaintiff's motion for preliminary approval of a class

27   settlement and conditional class certification on February 9, 2022.  (Doc. No. 55.)  The pertinent

28   factual background may be found in that order and will not be repeated here.  (*See id.* at 1–7.)

Following the grant of preliminary approval in this action, on April 18, 2022, plaintiff filed the pending unopposed motion for final approval of the parties' class action settlement and attorneys' fees, costs, and an incentive award.  (Doc. No. 56.)  In support of her pending motion, plaintiff submitted declarations from plaintiff, class counsel, and the settlement administrator.  (Doc. Nos. 56-2, 56-3, 56-4, 56-5, 56-6.)  As of the date of the hearing on May 16, 2022, no objections to the settlement or disputes to the workweek calculations had been received by the settlement administrator nor filed with the court, and no class members have opted out of the settlement. (Doc. No. 57 at ¶ 6–9.)  No class members appeared at the final approval hearing.

As summarized by the court in its order granting preliminary approval of the parties' settlement, the settlement agreement provides for a settlement payment made by defendant in the amount of $1,250,000.00 (the "gross settlement amount").  (Doc. No. 54-1 at 8.)  Assuming the parties' proposed allocations are awarded in full, approximately $717,833.75 (the "net settlement amount") will be available for distribution to participating class members.  (Doc. Nos. 54-1 at 8–10; 56-6 at 9.)

**FINAL CERTIFICATION OF SETTLEMENT CLASS**

In granting preliminary approval of the class action settlement, the court analyzed the class certification factors and found that certification was warranted.  (Doc. No. 55 at 11–19.) The court notes that the total size of the proposed class—805 putative class members—is larger than the approximately 690 individuals represented as the class size in the motion for preliminary approval.  (*Compare* Doc. No. 56-1 at 10–11 *with* Doc. No. 44-1 at 6.)  At the hearing on the pending motion for final approval, neither class counsel nor defendant's counsel had a full explanation for the class size discrepancy.  After the hearing, on May 27, 2022, defendant's counsel filed a declaration explaining, that an associate at her law firm working on this case had informed class counsel in March 2021 that the class size was 690, but that estimate was based on an outdated data set.  (Doc. No. 63 at ¶ 5.)  Instead, the correct data, which was provided to the settlement administrator after preliminary approval, established that there were actually 794 putative class members as of August 21, 2020 and that number grew to 805 putative class members by December 31, 2020 following additional hiring by defendant.  (*Id.* at ¶ 6.)  Aside

2

1    from this discrepancy, however, no additional issues concerning class certification have been

2    raised, and the court does not find that the increase in class members warrants revisiting any of its

3    previous class certification analysis.  *See Ontiveros v. Zamora*, 303 F.R.D. 356, 364 (E.D. Cal.

4    2014) (granting final certification of class even though a mistaken class size of 197 class

5    members was presented to the court at the preliminary approval stage; at final approval stage, the

6    court learned that the actual class size was 300).  The court finds that final class certification in

7    this case is appropriate.

8           The following class of an estimated 805 employees (the "class members") is therefore

9    certified for settlement purposes:

10                "Class Member" means the named Plaintiff in this Action and any
                 non-exempt employee who was employed by Defendant within the
11               State of California at any point from February 25, 2018 to date of
                 preliminary approval [(i.e., February 9, 2022)].  Class Member does
12               not include any individuals who already have resolved the claims
                 asserted in the Action, whether by settlement or adjudication, or
13               any of the thirty-three (33) individuals who have filed, or were
                 prepared to file by and through Class Counsel, demands for
14               individual arbitration.  The group of all Class Members meeting the
                 definition above are collectively referred to as the "Settlement
15               Class."

16   (Doc. Nos. 54-1 at 2; 56-1 at 8.)

17          In addition, and for the reasons stated in order granting preliminary approval (Doc. No. 55

18   at 15–17, 32), plaintiff Alicia Arredondo is confirmed as the class representative, attorneys

19   Joseph D. Sutton, Marco A. Palau, and Eric S. Trabucco of the Advocates for Worker Rights LLP

20   ("Advocates firm") are confirmed as class counsel, and Phoenix Class Action Administration

21   Solutions ("Phoenix") is confirmed as the settlement administrator.

22          In plaintiff's pending motion for preliminary approval, she requested that attorney Robert

23   Ottinger of the Ottinger Law Firm P.C. ("Ottinger firm") be appointed as co-class counsel in

24   addition to the Advocates firm (Doc. No. 44-1 at 27), but the court did not do so because plaintiff

25   did not provide any factual basis supporting that appointment.  (Doc. No. 55 at 17.)  In the

26   pending motion for final approval, plaintiff again seeks the appointment of attorney Ottinger as

27   co-class counsel and attached a declaration by attorney Ottinger in support of that appointment.

28   (Doc. No. 56-5.)

1    The adequacy of representation requirement is satisfied if "the representative parties will

2    fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  Resolution of

3    this issue requires the court to address the following questions: "(a) do the named plaintiffs and

4    their counsel have any conflicts of interest with other class members and (b) will the named

5    plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"  *Sali v.*

6    *Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1007 (9th Cir. 2018) ("Adequacy of representation also

7    depends on the qualifications of counsel.").

8        The court had determined before the hearing on final approval that attorney Ottinger's

9    declaration filed in support of the pending motion for final approval was not adequate to appoint

10   him co-class counsel because he had failed to disclaim any conflicts of interest with the class

11   members.  However, following the hearing, and at the court's direction, attorney Ottinger filed a

12   supplemental declaration in support of the pending motion on May 23, 2022.  (Doc. No. 60.)  In

13   his supplemental declaration, attorney Ottinger declared under oath that he has "no known

14   conflicts of interest with the Class" and that he "vigorously represented the interests of the Class."

15   (*Id.* at ¶¶ 27 – 28.)  According to attorney Ottinger, he prepared and filed the initial complaint in

16   this action, served as a liaison with the named plaintiff, and "actively participated in shaping the

17   strategy of this case at every step."  (*Id.* at ¶ 26.)

18       Attorney Ottinger's supplemental declaration also provided detail on his professional

19   background, his associates, and paralegals that billed hours in this case.  For instance, attorney

20   Ottinger declared that he has focused on employment law, including wage and hour class actions,

21   since he founded the Ottinger firm in 1999.  (*Id.* at ¶ 3–4.)  Attorney Ottinger cited 29 different

22   state and federal cases in California and New York where he has represented or continues to

23   represent plaintiffs in class or collective actions, putative class actions, or PAGA actions.  (*Id.* at ¶

24   5.)  Among the cases cited, attorney Ottinger represents that the Ottinger firm has been appointed

25   class counsel in 11 instances.  (*Id.* at ¶ 6.)  After describing most of the individuals at the Ottinger

26   firm who billed hours for conducting work in this case—including five associates attorneys and

27   ten paralegals (*id.* at ¶¶ 7–19)—attorney Ottinger has set out the hours worked by each individual

28   /////

4

1   and the costs incurred by the firm, including paying for a damages expert, mediation fee, and

2   filing fee.  (*Id.* at ¶¶ 22–23.)

3       Because attorney Ottinger has now represented that there are no conflicts of interest

4   between himself and class members and the Ottinger firm appears to be experienced wage-and-

5   hour counsel based on his declarations, the court finds that the adequacy of representation

6   requirement has been satisfied.  Accordingly, Robert Ottinger and the Ottinger firm will be

7   appointed as co-class counsel for purposes of this settlement.

8                    **FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

9       Class actions require the approval of the district court prior to settlement.  Fed. R. Civ.

10  P. 23(e).  To approve a settlement, a district court must:  (i) ensure notice is sent to all class

11  members; (ii) hold a hearing and make a finding that the settlement is fair, reasonable, and

12  adequate; (iii) receive a statement filed by the parties seeking final approval identifying the

13  settlement agreement; and (iv) be shown that class members were given an opportunity to object.

14  Fed. R. Civ. P. 23(e)(1)–(5).  The amended settlement agreement in this action was previously

15  filed on the court's docket (Doc. No. 54-1), and class members have been given an opportunity to

16  object to it, but none have done so.  The court now turns to the adequacy of notice and its review

17  of the overall settlement following the final fairness hearing.

18  **A.    Notice**

19      "Adequate notice is critical to court approval of a class settlement under Rule 23(e)."

20  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1025 (9th Cir. 1998), *overruled on other grounds by*

21  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011); *see also Silber v. Mabon*, 18 F.3d 1449,

22  1453–54 (9th Cir. 1994) (noting that the court need not ensure all class members receive actual

23  notice, only that "best practicable notice" is given); *Winans v. Emeritus Corp.*, No. 13-cv-03962-

24  HSG, 2016 WL 107574, at *3 (N.D. Cal. Jan. 11, 2016) ("While Rule 23 requires that 'reasonable

25  effort' be made to reach all class members, it does not require that each individual actually

26  receive notice.").  "Notice is satisfactory if it 'generally describes the terms of the settlement in

27  sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be

28  heard.'"  *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) (quoting

5

*Mendoza v. Tucson Sch. Dist. No. 1*, 623 F.2d 1338, 1352 (9th Cir. 1980)).  Any notice of the settlement sent to the class should alert class members of "the opportunity to opt-out and individually pursue any state law remedies that might provide a better opportunity for recovery." *Hanlon*, 150 F.3d at 1025.  It is important for class notice to include information concerning the attorneys' fees to be awarded from the settlement because it serves as "adequate notice of class counsel's interest in the settlement."  *Staton v. Boeing Co.*, 327 F.3d 938, 963 n.15 (9th Cir. 2003) (quoting *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir. 1993)) (noting that a notice's failure to clearly state the amount in attorneys' fees from the settlement amount means courts should "be all the more vigilant in protecting the interests of class members with regard to the fee award").

Here, the court reviewed the class notice that was proposed when the parties sought preliminary approval of the settlement and found it to be inadequate because it did not sufficiently inform class members of the nature and scope of claims that were being released under the settlement agreement.  (Doc. No. 49 at ¶ 3.)  In response to the court's concerns, the parties revised the class notice to clearly inform class members regarding the scope of the release of their claims that would result by participating in the settlement.  (*Compare* Doc. No. 44-4 (proposed class notice) *with* Doc. No. 52-2 (revised class notice).)  Thereafter, in its order granting preliminary approval, the court reviewed the revised class notice and found that it met the requirements of Rule 23(c)(2)(B).  (Doc. No. 55 at 30–32.)

Following the grant of preliminary approval, counsel for defendant provided the settlement administrator Phoenix with the last known mailing addresses for each of the 805 proposed class members.  (Doc. No. 56-6 at ¶ 3.)  Phoenix then conducted a national change of address search to update the list of proposed class members with current addresses and mailed the court-approved notice packet to each of the 805 proposed class members.  (*Id.* at ¶¶ 4–5.)  Of the 805 initial mailings, 21 were returned to Phoenix.  (*Id.* at ¶ 6.)  Of those 21 returned notice packets, one was returned with a forwarding address and Phoenix states that it promptly re-mailed the notice packet to that forwarding address.  (*Id.*)  Phoenix successfully performed a computerized skip trace on the remaining 20 notice packets that were returned without a

6

1    forwarding address and re-mailed notice packets to the updated mailing addresses obtained for

2    those 20 class members.  (*Id*.)  As of April 13, 2021, no notice packets were considered

3    undeliverable.  (*Id*. at ¶ 7.)  Thus, of the 805 total class members, all 805 are estimated to have

4    received actual notice of the settlement.

5         Given the above, the court accepts the reports of the settlement administrator and finds

6    adequate notice has been provided, thereby satisfying Rule 23(e)(1).  *See Silber*, 18 F.3d at 1453–

7    54; *Winans*, 2016 WL 107574, at *3.

8    **B.      Final Fairness Determination**

9         On May 16, 2022, the court held a final fairness hearing, at which class counsel and

10   defense counsel appeared by video.  No class members, objectors, or counsel representing the

11   same appeared at that hearing.  For the reasons explained below, the court now determines that

12   the settlement reached in this case is fair, reasonable, and adequate.  *See* Fed. R. Civ. P. 23(e)(2).

13        At the final approval stage, the primary inquiry is whether the proposed settlement "is

14   fundamentally fair, adequate, and reasonable."  *Lane v. Facebook, Inc.*, 696 F.3d 811, 818 (9th

15   Cir. 2012); *see also* Fed. R. Civ. P. 23(e)(2) ("[T]he court may approve it only after a hearing and

16   only on finding that it is fair, reasonable, and adequate . . . .").  "It is the settlement taken as a

17   whole, rather than the individual component parts, that must be examined for overall fairness."

18   *Hanlon*, 150 F.3d at 1026 (citing *Officers for Justice v. Civil Serv. Comm'n of S.F.*, 688 F.2d 615,

19   628 (9th Cir. 1982)); *see also Lane*, 696 F.3d at 818–19.  Having already completed a preliminary

20   examination of the settlement agreement, the court reviews it again, mindful that the law favors

21   the compromise and settlement of class action suits.  *See, e.g.*, *In re Syncor ERISA Litig.*, 516

22   F.3d 1095, 1101 (9th Cir. 2008); *Churchill Vill., L.L.C.,* 361 F.3d at 576; *Class Plaintiffs v. City

23   of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992); *Officers for Justice*, 688 F.2d at 625.  Ultimately,

24   "the decision to approve or reject a settlement is committed to the sound discretion of the trial

25   judge because he [or she] is exposed to the litigants and their strategies, positions, and proof."

26   *Staton*, 327 F.3d at 953 (quoting *Hanlon*, 150 F.3d at 1026).

27        In assessing whether a class action settlement is fair, reasonable, and adequate, courts

28   "look to the eight *Churchill* factors":

7

(1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement.

*In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 944 (9th Cir. 2015) (quoting *Churchill Vill., L.L.C.*, 361 F.3d at 575). These settlement factors are non-exclusive, and each need not be discussed if they are irrelevant to a particular case.[1] *Churchill Vill., L.L.C.*, 361 F.3d at 576 n.7.

However, the Ninth Circuit has found that consideration of the *Churchill* factors alone is not sufficient to survive appellate review. *See Briseño v. Henderson*, 998 F.3d 1014, 1022–26 (9th Cir. 2021) (holding that the revised Rule 23(e) requires district courts "to go beyond our precedent" and mandates consideration of "the *Bluetooth* factors" to all class action settlements,

---

[1] As part of the 2018 amendments to the Federal Rules of Civil Procedure, subsection (e)(2) was added to Rule 23, providing guidance to district courts in determining whether a class action settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). In so determining, the court must consider whether:

(A) the class representatives and class counsel have adequately represented the class;
(B) the proposal was negotiated at arm's length;
(C) the relief provided for the class is adequate, taking into account:
(i) the costs, risks, and delay of trial and appeal;
(ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
(iii) the terms of any proposed award of attorney's fees, including timing of payment; and
(iv) any agreement required to be identified under Rule 23(e)(3); and
(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. Pro. 23(e)(2). The purpose of the 2018 amendment "was not to displace any factor" previously generated by courts, "but rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the propos[ed settlement]." Fed. R. Civ. P. 23, Advisory Comm. Notes; *see also Kang v. Wells Fargo Bank, N.A.*, No. 17-cv-06220-BLF, 2021 WL 5826230, at *14 (N.D. Cal. Dec. 8, 2021) ("Consideration of *Churchill* factors is not precluded by the 2018 amendment to Rule 23."); *Stoddart v. Express Servs.*, No. 2:12-cv-01054-KJM-CKD, 2021 WL 5761083, at *2 (E.D. Cal. Dec. 3, 2021) ("Before these provisions were incorporated into Rule 23(e), the Ninth Circuit and other courts used similar factors to decide whether settlement agreements in class actions were 'fair, reasonable, and adequate.'").

1    regardless of whether settlement was achieved before or after class certification); *see also* Rule

2    23(e)(2)(C)–(D).  Under the revised Rule 23(e), "district courts must apply the *Bluetooth* factors

3    to scrutinize fee arrangements . . . to determine if collusion may have led to class members being

4    shortchanged."  *Briseño*, 998 F.3d at 1026.  The so-called *Bluetooth* factors—also referred to as

5    "subtle signs" of collusion—include:  (i) "when counsel receive a disproportionate distribution of

6    the settlement, or when the class receives no monetary distribution but class counsel are amply

7    rewarded"; (ii) the existence of a "clear sailing" arrangement, which provides "for the payment of

8    attorneys' fees separate and apart from class funds," or a provision under which defendant agrees

9    not to object to the attorneys' fees sought; and (iii) "when the parties arrange for fees not awarded

10   to revert to defendants rather than be added to the class fund."  *In re Bluetooth Headset Prods.*

11   *Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011) (internal quotations and citations omitted).  "The

12   presence of these three signs is not a death knell—but when they exist, 'they require[ ] the district

13   court to examine them, . . . develop the record to support its final approval decision,' and thereby

14   'assure itself that the fees awarded in the agreement were not unreasonably high.'"  *Kim v.*

15   *Allison*, 8 F.4th 1170, 1180 (9th Cir. 2021) (quoting *Allen v. Bedolla*, 787 F.3d 1218, 1224 (9th

16   Cir. 2015)).  Thus, while this court has wide latitude to determine whether a settlement is

17   substantively fair, it is held to a higher procedural standard, and in order "[t]o survive appellate

18   review . . . [it] must show it has explored comprehensively all factors, and must give a reasoned

19   response to all non-frivolous objections."  *McKinney-Drobnis v. Oreshack*, 16 F.4th 594, 606 (9th

20   Cir. 2021) (quoting *Allen*, 787 F.3d at 1223–24).

21          1.    Strength of Plaintiff's Case

22          When assessing the strength of a plaintiff's case, the court does not reach "any ultimate

23   conclusions regarding the contested issues of fact and law that underlie the merits of th[e]

24   litigation."  *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 720 F. Supp. 1379, 1388 (D. Ariz.

25   1989).  Instead, the court "evaluate[s] objectively the strengths and weaknesses inherent in the

26   litigation and the impact of those considerations on the parties' decisions to reach these

27   agreements."  *Id.*

28   /////

9

1     Here, plaintiff maintains that she "would likely prevail" on the unpaid wages claim and

2  derivative PAGA penalties at trial due to the underlying supporting documentation (i.e.,

3  defendant's security alarm reports for their 191 locations compared with class members'

4  timekeeping records showing time spent off-the-clock opening and closing defendant's stores).

5  (Doc. No. 56-1 at 12–13.)  However, plaintiff contends that securing PAGA penalties in

6  connection with her remaining causes of action would be less certain, and that penalties stemming

7  from purported rest break violations would lack supporting documentation because employers are

8  not required to keep such records under California law.  (*Id.* at 13.)  Due to these evidentiary

9  challenges, plaintiff contends she would face significant risks at trial, and even if she was

10  successful on the rest break claim, that result would likely be challenged on appeal.  (*Id.*)  Lastly,

11  plaintiff contends that defendant's "talented counsel" was prepared to vigorously defend against

12  her claims if the case did not settle.  (*Id.* at 12–13.)

13     Therefore, it appears that although plaintiff may have some meritorious claims, it is far

14  from certain that she would have prevailed or achieved full recovery on any of the asserted claims

15  aside from the unpaid wages claim.  The court finds that consideration of this factor somewhat

16  weighs in favor of granting final approval of the settlement in this action.

17       2.       Risk, Expense, Complexity, and Likely Duration of Further Litigation

18     When considering whether the relief for the class is "adequate," the court must take into

19  account "the costs, risks, and delay of trial and appeal."  Fed. R. Civ. P. 23(e)(2)(C)(i).  Because

20  "there is a strong judicial policy that favors settlements, particularly where complex class action

21  litigation is concerned," *In re Syncor ERISA Litig.*, 516 F.3d at 1101, the "[a]pproval of

22  settlement is preferable to lengthy and expensive litigation with uncertain results."  *Johnson v.*

23  *Shaffer*, No. 2:12-cv-01059-KJM-AC, 2016 WL 3027744, at *4 (E.D. Cal. May 27, 2016).  Of

24  course, employment law class actions are, by their nature, time-consuming and expensive to

25  litigate.  *See Hightower v. JPMorgan Chase Bank, N.A.*, No. 2:11-cv-01802-PSG-PLA, 2015 WL

26  9664959, at *6 (C.D. Cal. Aug. 4, 2015).

27     Here, class counsel advises the court that plaintiff would face "significant hurdles" in

28  securing a judgment in excess of what is being offered in the settlement agreement here.  (Doc.

1    No. 56-1 at 13.)  For instance, class counsel maintains that "[w]ithout this settlement Plaintiff

2    would spend time and resources preparing for a PAGA trial" and that even if she prevailed at that

3    trial, it would require class counsel to "expend substantial additional time and resources

4    potentially outweighing any additional recovery obtained through successful litigation." (*Id.*)  If

5    plaintiff proceeded with further litigation, class counsel also argues that it would "delay payment

6    to the workers who were systematically cheated out of small amounts of compensable time."

7    (*Id.*)  In addition, the evaluation of the strength of plaintiff's case also suggests there would be

8    risk and expense in seeking to prove her case at trial.  Thus, consideration of this factor also

9    weighs in favor of granting final approval.

10       3.       Risk of Maintaining Class Action Status Throughout Trial

11           Plaintiff did not address this factor in her pending motion.  Nonetheless, there does appear

12   to be some risk that plaintiff would not be able to maintain a class action through trial.  On

13   October 13, 2020, the parties submitted a stipulation stating that defendant "intended to file a

14   motion to deny class certification on the ground that a large percentage of the putative class

15   signed binding arbitration agreements" and thus plaintiff could not establish numerosity under

16   Rule 23.  (Doc. No. 38 at 2.)  As a result, plaintiff agreed to dismiss her class claims and proceed

17   only with her individual claims and representative PAGA claim.  (*Id.*; *see also* Doc. No. 41 (court

18   order granting parties stipulation).)  However, those class claims were later re-alleged in the

19   operative second amended complaint ("SAC") as part of the settlement now before the court.[2]

20   (Doc. No. 48.)  Thus, consideration of this factor also weighs in favor of granting final approval.

21       4.       Amount Offered in Settlement

22           To evaluate the fairness of the settlement award, the court should "compare the terms of

23   the compromise with the likely rewards of litigation."  *Protective Comm. for Indep. Stockholders*

24   *of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424–25 (1968); *see also* Fed. R. Civ. P

---

25   [2]  As noted in the order granting preliminary approval, class counsel explained that the settlement
26   "was premised on the understanding that Plaintiff would amend the operative complaint to re-
     plead the class allegations previously dismissed for the Class Period. . . . This was done in order
27   to maximize the monetary recovery for the 690 [now 805] workers who fell within the PAGA
     period (February 25, 2018 to December 31, 2020) and to afford Defendant with class-wide
28   relief."  (Doc. Nos. 44-2 at ¶ 21; 55 at 23 n.10.)

1    23(e)(2)(C)–(D).  "It is well-settled law that a cash settlement amounting to only a fraction of the

2    potential recovery does not *per se* render the settlement inadequate or unfair."  *In re Mego Fin.*

3    *Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000).  To determine whether a settlement "falls

4    within the range of possible approval" a court must focus on "substantive fairness and adequacy,"

5    and "consider plaintiffs' expected recovery balanced against the value of the settlement offer."  *In*

6    *re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1080 (N.D. Cal. 2007).  In addition, the court

7    must consider whether "the proposal treats class members equitably relative to each other" and

8    whether "the relief provided for the class is adequate."  Fed. R. Civ. P. 23(e)(2)(C)–(D).

9            Here, the parties have agreed to a $1,250,000.00 settlement amount.[3]  (Doc. No. 54-1 at

10   8.)  Under the parties' settlement agreement, the gross settlement amount of $1,250,000.00 is to

11   be allocated as follows:  (1) up to $416,666.25 (or 33.33%) for attorneys' fees and up to

12   $20,000.00 (or 1.6%) for attorneys' costs; (2) $10,000.00 (or 0.8%) for an incentive award to the

13   representative plaintiff; (3) $100,000.00 (or 8.0%) in civil PAGA penalties, with $75,000 of the

14   penalties payable to the California Labor and Workforce Development Agency ("LWDA"); and

15   (4) an estimated $10,500.00 (or 0.84%) for settlement administration costs.  (Doc. No. 54-1 at 8–

16   10.)  Assuming these allocations are awarded in full, the net settlement amount will be

17   $717,833.75.  (*Id.*)  Each individual class member's share of the net settlement amount will be

18   proportional to the number of weeks worked during the applicable time period in comparison to

19   the aggregate number of weeks worked by all class members during that period.  (*Id.*)  This

20   payment mechanism ensures class members are treated "equitably relative to each other."  Fed. R.

21   Civ. P. 23(e)(2)(D).  The settlement administrator estimates that the average gross payment to

22   class members will be $891.72, while the highest gross payment will be $1,802.93 and the lowest

23   /////

24   /////

25   /////

26   _____

27   [3]  Throughout the pending motion for final approval, class counsel repeatedly refers to the gross
     settlement amount as "$1,225,000."  (*See, e.g.*, Doc. No. 56-1 at 7, 14.)  At the final approval
     hearing on May 16, 2022, class counsel explained that this was a typographical error and that the
28   $1,250,000 amount reflected in the settlement agreement (Doc. No. 54-1) is the correct amount.

$1.70, respectively.[4]  (Doc. No. 56-1 at 14.)  None of the net settlement amount will revert to defendant; the settlement agreement provides that any funds from uncashed checks, if amounting to $10,000 or more, will be distributed to each class member who cashed their individual settlement amount.  (Doc. No. 54-1 at 13, 18.)  If the total uncashed checks amount to less than $10,000, the balance will be donated to California Rural Legal Assistance.  (*Id.* at 13.)

Plaintiff argues that the settlement's "monetary relief is well within the range of possible approval based on recovery as a percent of maximum exposure."  (Doc. No. 56-1 at 14.)  In addition to providing a sizable average payment to class members, "Defendant will also pay separately its share of employer payroll taxes—a further benefit to the Class."  (*Id.*)  As class counsel details in the pending motion, the monetary relief obtained "provides good value when contrasted to the maximum estimated damages."  (*Id.*)  Specifically, the damages modeling commissioned by plaintiff's counsel in advance of mediation shows that the PAGA penalties underlying the alleged Labor Code violations amounts to approximately $11,697,600 in total. (*Id.*)  Moreover, only 25% of the total PAGA penalties would be recoverable as cash payments to the class members, which amounts to $2,924,400 (i.e., 0.25 multiplied by $11,697,600), because the other 75% would be allocated to the LWDA.  (*Id.*)  Viewed from this perspective, the $1,250,000 gross settlement amount represents 43% of the maximum value of the class that would be directed to workers, or at minimum, it amounts to approximately 10.7% of the total possible PAGA penalties recovery (i.e., $1,250,000 divided by $11,697,600).  (*Id.*)  However, that 43% rate of recovery is only as to what class counsel deems to be plaintiff's viable claim—

/////

/////

/////

/////

---

[4]  This amount assumes that the court will award class counsel $20,000.00 in litigation expenses, but class counsel has only attested to litigation expenses in the amount of $11,101.30.  (Doc. No. 56-1 at 26.)  Under the settlement agreement, that difference ($20,000.00 less $11,101.30) must be allocated back into the net settlement amount.  (Doc. No. 54-1 at 9.)  Accordingly, given the decrease in the allocation of gross settlement amount toward class counsel's litigation expenses, the average individual recovery for class members in this case will be closer to $902.77.

1    i.e., her PAGA claim.[5]  Class counsel further points out that the total recovery of PAGA penalties

2    can be adjusted downwards in a court's discretion under California Labor Code § 2699(e)(2).

3    (*Id.*)

4         On balance, the court finds this settlement amount is not unreasonable, and notes that

5    other district courts in California have found lower percentage recoveries to be reasonable under

6    similar circumstances.  *See, e.g.*, *Balderas v. Massage Envy Franchising, LLC*, No. 12-cv-06327-

7    NC, 2014 WL 3610945, at *5 (N.D. Cal. July 21, 2014) (settlement of approximately 5% found

8    to be preliminarily fair); *Maciel et al., v. Bar 20 Dairy, LLC*, No. 1:17-cv-00902-DAD-SKO,

9    2021 WL 1813177, at *6 (E.D. Cal. May 6, 2021) (settlement of approximately 3% found to be

10   fair and adequate); *see also* (Doc. No. 55 at 23 (order granting preliminary approval collecting

11   cases).)  Moreover, at the preliminary approval stage, the court assessed this settlement amount

12   and recovery rate and found that it was fair, reasonable, and adequate under the circumstances.

13   (Doc. No. 55 at 22–25.)

14        At the final approval stage, the only difference in this respect is that the average payment

15   of $891.72 to class members is 14.3% lower than the average payment of $1,040.33 that plaintiff

16   represented to the court in its motion for preliminary approval.  (Doc. No. 44-1 at 18.)  As

17   confirmed in defendant's counsel's declaration filed after the final approval hearing (Doc. No.

18   63), the reduced average payment amount is due to the increase in the class by 115 class members

19   between the preliminary and final approval stages of this litigation.  As noted above, the class size

20

21   ---
     [5]  Although the 43% recovery rate is technically only the recovery rate on plaintiff's PAGA
22   claim, not the entirety of the class claims alleged in the operative SAC (*see* Doc. Nos. 48), it is
     the best available data before the court.  The total percentage recovery rate when considering the
23   total possible damages of all the alleged class claims in the SAC is unknown because class
     counsel only prepared a damages estimate for the PAGA claim.  (Doc. No. 56-1 at 22.)  It was
24   reasonable that a PAGA-only damages estimate was prepared because when the parties entered
     into the mediation that led to the settlement before the court, the class claims in the first amended
25   complaint had already been dismissed pursuant to an order of this court.  (Doc. Nos. 41; 55 at 22–
     25.)  As previously discussed in the court's order granting preliminary approval, plaintiff dropped
26   her class claims because discovery revealed that nearly all the class members are bound by
     arbitration agreements and class action waivers.  (Doc. No. 55 at 22–25.)  Thus, the focus of the
27   mediation that led to this settlement was on the value of the PAGA claim and the class claims
     were only added back into the SAC after the motion for preliminary approval was filed for
28   settlement purposes.  (Doc. No. 48.)

                                                    14

1    was increased because class counsel was provided outdated information on the class size in

2    advance of preparing the motion for preliminary approval.  (*Id.* at ¶ 5.)  Notwithstanding this

3    reduction in the average payment, the gross settlement amount remains the same, and the average

4    amount of recovery is still not insubstantial.  *See Barbosa v. Cargill Meat Sols. Corp.*, 297 F.R.D.

5    431, 447 (E.D. Cal. 2013) (granting final approval in wage-and-hour class action where average

6    payment was estimated at $601.91 and total settlement amount was $1.29 million).  The court

7    finds that the settlement in this case remains appropriate and fair.  Thus, consideration of this

8    factor also weights in favor of final approval.

9                          a.    *PAGA Penalties Amount Offered in Settlement*

10           The settlement also provides for $100,000.00 in civil PAGA penalties.  (Doc. No. 54-1 at

11   9–10.)  Under PAGA, 75% of the civil penalties, or $75,000.00, will go to the LWDA, and 25%,

12   or $25,000.00, will be included in the net settlement amount.  (*Id.*); *see* Cal. Lab. Code § 2699(i).

13           Although there is no binding authority setting forth the proper standard of review for

14   PAGA settlements, California district courts "have applied a Rule 23-like standard, asking

15   whether the settlement of the PAGA claims is 'fundamentally fair, adequate, and reasonable in

16   light of PAGA's policies and purposes.'"  *Haralson v. U.S. Aviation Servs. Corp.*, 383 F. Supp.

17   3d 959, 972 (N.D. Cal. 2019).  This standard is derived from the LWDA.  In commenting on a

18   proposed settlement including both class action and PAGA claims, the LWDA offered the

19   following guidance in this regard:

20           It is thus important that when a PAGA claim is settled, the relief
             provided for under the PAGA be genuine and meaningful,
21           consistent with the underlying purpose of the statute to benefit the
             public and, in the context of a class action, the court evaluate
22           whether the settlement meets the standards of being "fundamentally
             fair, reasonable, and adequate" with reference to the public policies
23           underlying the PAGA.

24   *O'Connor v. Uber Techs., Inc.*, 201 F. Supp. 3d 1110, 1133 (N.D. Cal. 2016) (citing the LWDA's

25   guidance with approval).[6]  Recognizing the distinct issues presented by class actions, this court is

26   ───────────────

27   [6]  The LWDA also stated that it "is not aware of any existing case law establishing a specific
     benchmark for PAGA settlements, either on their own terms or in relation to the recovery on
     other claims in the action."  *O'Connor v. Uber Techs., Inc.*, No. 3:13-cv-03826-EMC (N.D. Cal.

28   Jul. 29, 2016) (Doc. No. 736 at 2–3).

persuaded by the LWDA's reasoning in *O'Connor* and therefore adopts its proposed standard in evaluating the PAGA portion of the settlement now before the court. *See, e.g.*, *Castro v. Paragon Indus., Inc.*, No. 1:19-cv-00755-DAD-SKO, 2020 WL 1984240, at *6 (E.D. Cal. Apr. 27, 2020); *Patel v. Nike Retail Servs., Inc.*, No. 14-cv-04781-RS, 2019 WL 2029061, at *2 (N.D. Cal. May 8, 2019).

The proposed $100,000.00 penalty payment in this case represents 8.0% of the estimated $1,250,000 gross settlement amount. (Doc. No. 54-1 at 10–11.) Judges in this district have previously approved comparable PAGA penalties in other class actions. *See, e.g.*, *Syed v. M-I, L.L.C.*, No. 1:12-cv-01718-DAD-MJS, 2017 WL 714367, at *13 (E.D. Cal. Feb. 22, 2017) (approving $100,000 for PAGA penalties which represented 1.4% of the gross settlement amount); *Garcia v. Gordon Trucking, Inc.*, No. 1:10-cv-0324-AWI-SKO, 2012 WL 5364575, at *7 (E.D. Cal. Oct. 31, 2012) (approving $10,000 for PAGA penalties representing 0.27% of the gross settlement amount). Moreover, as required by PAGA, California Labor Code § 2699(*l*)(2), class counsel has represented in the pending motion that he notified LWDA of the proposed settlement and did not receive any response. (Doc. No. 56-1 at 10.) Having reviewed the parties' submission and the terms of the proposed settlement, the court finds that the settlement amount related to plaintiff's PAGA claims is fair, reasonable, and adequate in light of PAGA's public policy goals.

Thus, the court finds that the amount offered in settlement of the PAGA claims here weighs in favor of final approval of the settlement.

### 5.   Extent of Discovery Completed and Stage of the Proceedings

"In the context of class action settlement, 'formal discovery is not a necessary ticket to the bargaining table' where the parties have sufficient information to make an informed decision about settlement." *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998) (quoting *In re Chicken Antitrust Litig.*, 669 F.2d 228, 241 (5th Cir. 1982)). Approval of a class action settlement thus "is proper as long as discovery allowed the parties to form a clear view of the strength and weaknesses of their case." *Monterrubio v. Best Buy Stores, L.P.*, 291 F.R.D. 443, 454 (E.D. Cal. 2013). A settlement is presumed fair if it "follow[s] sufficient discovery and

16

genuine arms-length negotiation." *Adoma v. Univ. of Phx., Inc.*, 913 F. Supp. 2d 964, 977 (E.D. Cal. 2012) (quoting *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004)).  The court must consider whether the process by which the parties arrived at their settlement is truly the product of arm's length bargaining, rather than collusion or fraud.  *Millan v. Cascade Water Servs., Inc.*, 310 F.R.D. 593, 613 (E.D. Cal. 2015).  These concerns are also reflected in Rule 23(e)(2)'s focus on procedural fairness—whether "the class representatives and class counsel have adequately represented the class" and whether "the proposal was negotiated at arm's length."  Fed. R. Civ. P. 23(e)(2)(A)–(B).

Here, plaintiff asserts the parties "were well-informed about the relative strengths of their positions" when reaching settlement in this action.  (Doc. No. 56-1 at 15.)  For instance, plaintiff contends that before the parties' mediation that led to the settlement before the court, defendant produced 45,000 pages of class-wide discovery in response to her successful motion to compel.  (*Id.*)  From that production, plaintiff obtained "critical" class member timekeeping and payroll data and security alarm reports for defendant's 191 locations in California, which served as the basis for calculating unpaid wages.  (*Id.*)  From the data and reports, plaintiff could project class-wide damages for workers not paid for time spent opening the store after arriving and disarming the security alarm but before clocking in.  (*Id.*)  Likewise, plaintiff discovered that contrary to defendant's policy of automatically paying meal period premiums when a meal period was missed, shortened, or taken late, the data showed that defendant did so for only 24,016 shifts out of a total of 29,790 shifts where a meal period was not recorded, shortened, or taken late.  (*Id.*)  Plaintiff also discovered that there was a total of 346,382 shifts in which the proper number of rest breaks were not recorded, despite defendant's policy to the contrary.  (*Id.*)  The foregoing data served as the basis for class counsel's calculations, and in turn, plaintiff's negotiations in reaching the settlement.  (*Id.*)  As further detailed in the court's order granting preliminary approval, the proposed settlement was also the product of a mediation and a mediator's proposal after the parties' attended a day-long mediation and prepared briefing and made factual presentations.  (Doc. No. 55 at 21.)  Based on these representations, the court concludes that the parties' mediation, which resulted in their settlement, constituted genuine, informed, arm's length

1   bargaining.  Accordingly, the court concludes that consideration of this factor also weighs in

2   favor of granting final approval of the settlement.

3         6.     Experience and Views of Counsel

4         Plaintiff contends that the class members have been represented by attorneys who are

5   "very experienced in the areas of law at issue here."  (Doc. No. 56-1 at 16.)  Class counsel Jeffrey

6   Sutton of the Advocates firm submitted declarations in support of the pending motion for final

7   approval and for attorneys' fees and the previous motion for preliminary approval, detailing his

8   firm's extensive experience in litigating wage and hours class actions and explaining why this

9   settlement is fair and reasonable in the view of class counsel.  (*See* Doc. Nos. 56-2, 44-2.)  Class

10  counsel Robert Ottinger of the Ottinger firm also submitted declarations in support of the pending

11  motion for final approval and motion for attorneys' fees, detailing his firm's extensive experience

12  in litigation wage and hours class actions.  (Doc. Nos. 56-5, 60.)  As argued in the pending

13  motion and the previous motion for preliminary approval, class counsel "strongly support"

14  approval of the proposed settlement.  (Doc. No. 56-1 at 16.)

15        Thus, consideration of class counsel's experience and expressed opinions in this regard

16  also weighs in favor of final approval of the settlement.

17        7.     Presence of a Governmental Participant

18        The settlement agreement contemplates payment of $100,000 of the settlement amount to

19  the LWDA under PAGA.  (Doc. Nos. 56-1 at 10; 54-1 at 10–11.)  This too weighs in favor of

20  approval of the settlement.  *See Adoma*, 913 F. Supp. 2d at 977 (factoring civil PAGA penalties as

21  weighing in favor of settlement approval); *Zamora v. Ryder Integrated Logistics, Inc.*, No. 13-cv-

22  2679-CAB-BGS, 2014 WL 9872803, at *10 (S.D. Cal. Dec. 23, 2014) (same).

23        8.     Reaction of the Class Members

24        The absence of objections to a proposed class action settlement supports the conclusion

25  that the settlement is fair, reasonable, and adequate.  *See Nat'l Rural Telecomms. Coop.*, 221

26  F.R.D. at 529 ("The absence of a single objection to the Proposed Settlement provides further

27  support for final approval of the Proposed Settlement.") (citing cases); *Barcia v. Contain-A-Way,*

28  *Inc.*, No. 07-cv-938-IEG-JMA, 2009 WL 587844, at *4 (S.D. Cal. Mar. 6, 2009) (same).

1    According to the declaration of Kevin Lee, Case Manager for Phoenix, who serves as the

2    settlement administrator in this case, no member of the class has filed an objection to the

3    settlement pending before the court for final approval and no member of the class requested to be

4    excluded from the settlement.  (Doc. Nos. 56-6 at ¶¶ 8–9; 57 at ¶¶ 6–9.)  Similarly, no class

5    members appeared at the final fairness hearing to raise any objections to the settlement and class

6    counsel and defendant's counsel confirmed that neither had received any such objections.

7    Accordingly, consideration of this factor weighs significantly in favor of granting final approval.

8                9.       Subtle Signs of Collusion

9           The court now turns to a review of whether any of the "more subtle signs" of collusion

10   recognized by the Ninth Circuit are present here.  *See Bluetooth*, 654 F.3d at 947.

11          First, the court does not find that class counsel is seeking a disproportionate distribution of

12   the settlement even though the award of attorneys' fees sought here—one-third of the gross

13   settlement amount—is on the high end of amounts typically awarded in the Ninth Circuit.  *See*

14   *Morales v. Stevco, Inc.*, No. 1:09-cv-00704-AWI-JLT, 2011 WL 5511767, at *12 (E.D. Cal. Nov.

15   10, 2011) ("The typical range of acceptable attorneys' fees in the Ninth Circuit is 20% to 33 1/3%

16   of the total settlement value, with 25% considered the benchmark.") (citing *Powers v. Eichen*,

17   229 F.3d 1249, 1256 (9th Cir. 2000)); *Castro v. Paragon Indus., Inc.*, No. 1:19-cv-00755-DAD-

18   SKO, 2021 WL 20242333, at *5, *12 (E.D. Cal. May 21, 2021) (granting final approval of a class

19   and collective action settlement with an average individual class member recovery of $1,070.62

20   and an award of $1,031,250.00 in attorneys' fees).

21          Second, the settlement here includes a version of a "clear sailing" arrangement, in which

22   defendant agreed not to oppose plaintiff's request for a maximum award of $416,666.25 or one-

23   third of the gross settlement amount in attorneys' fees.  (Doc. No. 54-1 at 9.)  Although the "very

24   existence of a clear sailing provision increases the likelihood that class counsel will have

25   bargained away something of value to the class," *Bluetooth*, 654 F.3d at 948 (citation omitted),

26   the existence of a clear sailing provision is not necessarily fatal to final approval.  Rather, "when

27   confronted with a clear sailing provision, the district court has a heightened duty to peer into the

28   provision and scrutinize closely the relationship between attorneys' fees and benefit to the class."

                                            19

1   *Id.* (citing *Staton*, 327 F.3d at 954).  Although plaintiff does not squarely address the "clear

2   sailing" in her pending motion, she contends that awarding one-third of the gross settlement

3   amount is well-supported by case law and warranted based on the recovery achieved in this case

4   in light of the risks taken.  (Doc. No. 56-1 at 19–24.)  Plaintiff notes that when dealing with a

5   "smaller fund case"—defined as a case with a fund of less than $10 million—such as this one, an

6   award of one-third of the gross settlement amount is appropriate to adequately compensate

7   counsel for their time.  (*Id.* at 19–20.)  Plaintiff also argues that the monetary relief achieved for

8   class members is "excellent" and "significant" here because it results in an average payment of

9   $891.72, with the highest award being $1,802.93.  (*Id.* at 22.)  Indeed, plaintiff contends she

10  proceeded with the litigation and achieved these results, notwithstanding the fact that early on it

11  was discovered that "the overwhelming majority" of class members were bound by arbitration

12  agreement and class action waivers.  (*Id.* at 23.)  The court further notes again that none of the

13  class members have objected to this settlement or requested to be excluded from it.

14       Third, the parties did not arrange for any unawarded amount of fees to revert to defendant.

15  According to the parties' settlement agreement, any funds remaining from uncashed checks will

16  be transmitted either to class members that did cash their checks (if the amount remaining is

17  $10,000 or more) or to California Rural Legal Assistance (if the amount is less than $10,000).

18  (Doc. No. 54-1 at 15.)  The settlement agreement further provides that any attorneys' fees or costs

19  less than $436,666.25 ($416.666.25 in attorneys' fees plus $20,000 in litigation costs) will be

20  retained in the net settlement mount for distribution to the class members.  (*Id.* at 9.)

21       Based upon its consideration of all of these factors, the court is satisfied that the subtle

22  signs of collusion that the Ninth Circuit has warned of are not sufficiently present here to warrant

23  the rejecting of the parties' proposed settlement.

24       In sum, after considering all of the relevant factors, the court finds on balance that the

25  settlement is fair, reasonable, and adequate.  *See* Fed. R. Civ. P. 23(e).  Accordingly, the court

26  will grant plaintiff's motion for final approval of the parties' class action settlement.

27  /////

28  /////

20

**ATTORNEYS' FEES, COSTS, AND INCENTIVE PAYMENT**

Plaintiff's pending motion also seeks awards of attorneys' fees, class counsel's litigation expenses, settlement administrator costs to Phoenix, and an incentive award for plaintiff Arredondo.  (Doc. No. 56-1 at 17–27.)

**A.    Attorneys' Fees**

This court has an "independent obligation to ensure that the award [of attorneys' fees], like the settlement itself, is reasonable, even if the parties have already agreed to an amount." *Bluetooth*, 654 F.3d at 941.  This is because, when fees are to be paid from a common fund, the relationship between the class members and class counsel "turns adversarial." *In re Mercury Interactive Corp. Secs. Litig.*, 618 F.3d 988, 994 (9th Cir. 2010); *In re Wash. Pub. Power Supply Sys. Secs. Litig.*, 19 F.3d 1291, 1302 (9th Cir. 1994).  As such, the district court assumes a fiduciary role for the class members in evaluating a request for an award of attorneys' fees from the common fund. *In re Mercury*, 618 F.3d at 994; *see also Rodriguez v. Disner*, 688 F.3d 645, 655 (9th Cir. 2012); *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 968 (9th Cir. 2009).

In a diversity action such as this, federal courts apply state law both to determining the right to fees and the method of calculating them. *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002); *Mangold v. Cal. Public Utils. Comm'n*, 67 F.3d 1470, 1478 (9th Cir. 1995).  The California Supreme Court has clarified that the percentage-of-fund method of calculating attorneys' fees remains appropriate under California law. *Laffitte v. Robert Half Int'l Inc.*, 1 Cal. 5th 480, 503–06 (2016).  Thus, under California law a court "may determine the amount of a reasonable fee by choosing an appropriate percentage of the fund created." *Id.* at 503.  The California Supreme Court has also suggested that considerations of the risks and potential value of the litigation, the contingency, novelty, and difficulty of the litigation, the skill shown by counsel, and a lodestar cross-check are all appropriate means of discerning an appropriate percentage award in a common fund case. *Id.* at 504.  Notably, although the California Supreme Court has recognized the Ninth Circuit's 25% benchmark for percentage awards in common fund cases, it did not adopt such a benchmark under California law. *Id.* at 495, 503–06 (affirming an attorneys' fee recovery for a wage-and-hour class action of one-third of a $19 million settlement

1    fund and a lodestar cross-check that used a multiplier of between 2.03 and 2.13).  In common

2    fund percentage award cases, the Ninth Circuit has similarly provided a non-exhaustive list of

3    factors to be considered in assessing the reasonableness of the award, including:

> the extent to which class counsel achieved exceptional results for the class, whether the case was risky for class counsel, whether counsel's performance generated benefits beyond the cash settlement fund, the market rate for the particular field of law (in some circumstances), the burdens class counsel experienced while litigating the case (e.g., cost, duration, foregoing other work), and whether the case was handled on a contingency basis.

8    *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d at 954–55 (quoting *Vizcaino*, 290 F.3d at

9    1047–50) (internal quotation marks omitted)).  The Ninth Circuit has approved the use of lodestar

10   cross-checks as a way of determining the reasonableness of a particular percentage recovery of a

11   common fund.  *Vizcaino*, 290 F.3d at 1050 ("Where such investment is minimal, as in the case of

12   an early settlement, the lodestar calculation may convince a court that a lower percentage is

13   reasonable.  Similarly, the lodestar calculation can be helpful in suggesting a higher percentage

14   when litigation has been protracted.").  The Ninth Circuit has permitted courts to award attorneys'

15   fees using this method "in lieu of the often more time-consuming task of calculating the lodestar."

16   *Bluetooth*, 654 F.3d at 942.

17          Where, as here, a lodestar is merely being used as a cross-check, the court "may use a

18   'rough calculation of the lodestar.'"  *Bond v. Ferguson Enters., Inc.*, No. 1:09-cv-01662-OWW-

19   MJS, 2011 WL 2648879, at *12 (E.D. Cal. June 30, 2011) (quoting *Fernandez v. Victoria Secret*

20   *Stores, LLC*, No. 2:06-cv-04149-MMM-SH, 2008 WL 8150856 (C.D. Cal. July 21, 2008)).

21   Moreover, beyond simply the multiplication of a reasonable hourly rate by the number of hours

22   worked, a lodestar multiplier is often applied.  "Multipliers in the 3–4 range are common in

23   lodestar awards for lengthy and complex class action litigation."  *Van Vranken v. Atl. Richfield*

24   *Co.*, 901 F. Supp. 294, 298 (N.D. Cal. 1995) (citing *Behrens v. Wometco Enters., Inc.*, 118 F.R.D.

25   534, 549 (S.D. Fla. 1988)); *see also* 4 Newberg on Class Actions § 14.7 (4th ed.) (stating courts

26   typically approve percentage awards based on lodestar cross-checks of 1.9 to 5.1 or even higher,

27   and "the multiplier of 1.9 is comparable to multipliers used by the courts"); *In re Prudential Ins.*

28   *Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 341 (3d Cir. 1998) ("[M]ultiples

ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied.") (quoting 4 Newberg on Class Actions § 14.7 (4th ed.)).

Here, the settlement provides that class counsel will seek an award of one-third of the gross settlement amount of $1,250,000.00, equivalent to $416,666.25.  (Doc. No. 54-1 at 9.)  The court approved class counsel's request for attorneys' fees on a preliminary basis but noted that class counsel did "not provide any explanation for the proposed departure from the 25% benchmark" in the Ninth Circuit.  (Doc. No. 55 at 28.)   At the preliminary approval stage, the court tentatively accepted a measured departure from the benchmark because of the favorable relief obtained for class members.  (*Id.*)  However, the court also noted that it would "carefully re-examine the award of attorneys' fees and conduct a final lodestar cross-check" at the final approval stage.  (*Id.*)  The court will now turn to its re-examination of the proposed attorneys' fee award.  Class counsel contends a fee award of one-third of the gross settlement amount (i.e., the common fund here) is reasonable here for several reasons.

First, class counsel contend that an "upward departure" from the 25% benchmark is "often appropriate for small class funds below $10 million" and that "[i]n similar wage and hour lawsuits, district courts in California have routinely awarded attorneys' fees equaling at least one-third of the common fund."  (Doc. No. 56-1 at 20) (citing cases).  Second, class counsel contend that awards between 30% and 33 1/3% are "routinely awarded" in the Eastern District of California.  (*Id.* (citing cases).)  Third, class counsel argue they achieved "excellent" results—i.e., average individual settlement payments of $891.72 with the highest approximate payment being $1,802.93—for class members when considering that (i) this average is significant relative to the class members' wages during the class period (e.g., plaintiff earned $25.10 per hour at the time of her termination after working for defendant for ten years and serving in the role of store manager), and (ii) the gross settlement amount of $1,250,000 amounts to approximately 43% of the total possible PAGA penalties that could have been distributed in direct payments to class members (i.e., only 25% of the total projected PAGA penalties could have gone to individual settlement payments, which means the total cash available to class members if all penalties were recovered would have been $2,924,400).  (*Id.*)  Fourth, class counsel contend that they took on

23

1    "substantial risk" because "relatively early-on in the litigation" class counsel learned that most of

2    the class members were bound by arbitration agreements and class action waivers, rendering this

3    action "a PAGA case for damage purposes." (Doc. No. 56-1 at 22–23.) As class counsel

4    elaborate, a PAGA case has disadvantages: (i) it eliminated the possibility of a larger damages

5    model based on class-wide labor code violations impacting class members for a longer period of

6    time; and (ii) PAGA penalty awards are subject to downward adjustments in the discretion of the

7    court and "it is not uncommon for courts to reduce the available PAGA penalties based on their

8    evaluation of the case." (*Id.* at 23.) Fifth, as class counsel contend, discovery also revealed that

9    plaintiff's rest break claim—representing approximately 30% of the total projected PAGA

10   penalties—was tenuous because it relied solely on testimony and had no supporting documentary

11   proof. (*Id.*) Finally, class counsel argue that their requested fee is reasonable because of the risk

12   of litigating on a contingency basis, and that since this case was filed in December 2018, class

13   counsel have not been compensated or received any reimbursements for litigation costs. (*Id.* at

14   23–24.)

15        The court agrees that consideration of all these factors support finding that the requested

16   fee award departing from the Ninth Circuit's benchmark is fair and reasonable. *See Laffitte*, 1

17   Cal. 5th at 504. Indeed, in the court's order granting preliminary approval, the court

18   independently pointed out the recovery rate, the significance of the individual settlement amounts

19   relative to class members' wages, and the existence of arbitration agreements and class action

20   waivers binding most class members, as reasons suggesting the settlement was fair, adequate, and

21   reasonable and evidencing the superiority of the class device. (Doc. No. 55 at 19, 24–25.) A

22   departure from the benchmark is also supported by the absence of any objections to the settlement

23   or requests for exclusions. The class notice specifically advised class members that class counsel

24   would seek $416,666.25 from the gross settlement amount for attorneys' fees. (Doc. Nos. 56-6 at

25   ¶¶ 9, 11; 57 at ¶¶ 6–9.) Class counsel's request for attorneys' fees thus appears to have the

26   support of the class and that support clearly weighs in favor of the requested award.

27        The court next turns to the lodestar amount to cross-check the reasonableness of the

28   requested attorneys' fee award. Here, class counsel first asserts that the total lodestar amount is

24

$591,436, which consists of $427,430 in fees generated from the Advocates firm and $164,006 in fees generated from the Ottinger firm.  (Doc. No. 56-2 at ¶ 14.)  Class counsel's proposed lodestar exceeds the requested one-third of the gross settlement amount by $174,769.75 and thus awarding the requested amount would result in an approximate 0.7 multiplier (i.e., a 30% reduction of the lodestar fee amount).  (*Id.*)  After the hearing on the pending motion, attorney Ottinger filed a supplemental declaration on May 23, 2022, clarifying that the total amount the Ottinger firm billed was actually $105,896.  (Doc. No. 60 at ¶ 22.)  Thus, class counsel's proposed lodestar amount based on attorney Ottinger's supplemental declaration has been revised to $533,326, though that amount still exceeds the requested one-third of the gross settlement amount by $116,659.75.  (*Id.*)  Thus, awarding the requested amount versus class counsel's proposed lodestar would result in a 0.78 multiplier (i.e., a 22% reduction of the lodestar fee amount).

Class counsel's requested hourly rates and supporting documentation, however, do not support a lodestar amount this high, even considering attorney Ottinger's supplemental declaration.  The Advocates' firm asserts they are entitled to hourly rates of $650, $750, and $850 for their three different attorneys, while the Ottinger firm claims rates of $550 or $650 for their attorneys.  (Doc. Nos. 56-2 at ¶ 13; 56-5 at ¶ 17; 63 at ¶ 17.)  Some of these rates—especially partners Sutton ($750) and Palau ($850) of the Advocates firm and associates Dusenbery and Mailhot of the Ottinger firm ($650)—are substantially higher than the hourly rates previously accepted by the undersigned as reasonable.  *See Singh v. Roadrunner Intermodal Servs., LLC*, No. 1:15-cv-01497-DAD-BAM, 2019 WL 316814, at *10 (E.D. Cal. Jan. 24, 2019) (accepting hourly rates of between $370 and $495 for associates, and $545 and $695 for senior counsel and partners); *Mathein v. Pier 1 Imports (U.S.), Inc.*, No. 1:16-cv-00087-DAD-SAB, 2018 WL 1993727, at *11 (E.D. Cal. Apr. 27, 2018) (approving hourly rates of between $475 and $575 for associates, and $675 and $750 for senior counsel and partners); *Emmons v. Quest Diagnostics Clinical Labs., Inc.*, 1:13-cv-00474-DAD-BAM, at *8 (E.D. Cal. Feb. 27, 2017) (approving of hourly rates of between $330 and $550 for associates, and $500 and $720 for partners).  The court will adjust these three rates downward to match the highest amounts that the undersigned has

25

previously accepted as hourly rates[7]—$750 for partner Palau and $720 for partner Sutton and $575 for associates Dusenbery and Mailhot.  In addition, the court observed some irregularities in the billing records that warrant a downward adjustment in the amount of hours billed by both firms representing plaintiff.[8]  Using these lower hourly rates and adjusting for the billing irregularities, the court's calculated lodestar is $479,416.[9]  *See Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 264 (N.D. Cal. 2015) ("[I]t is well established that '[t]he lodestar cross-check calculation need entail neither mathematical precision nor bean counting . . . [courts] may rely on summaries submitted by the attorneys and need not review actual billing records.'") (quoting *Covillo v. Specialtys Café*, No. 4:11-cv-00594-DMR, 2014 WL 954516 (N.D. Cal. Mar. 6, 2014)).  To reach the amount of $416,666.25 in fees that class counsel has requested here, an approximate 0.87 multiplier would still have to be applied to the court's lodestar calculation (i.e., a 13% reduction in lodestar fees).

For the reasons set forth above, the court concludes that the lodestar cross-check supports the requested award of $416,666.25 in attorneys' fees, an amount equal to one-third of the gross settlement amount in this case.  *See Barbosa*, 297 F.R.D. at 448 (granting one-third of common fund attorneys fee award in wage-and-hour settlement for $1.29 million with class size of 1,837 and lodestar multiplier of 1.06).

---

[7]  Since this hourly rate will be used solely for the purpose of cross-checking the percentage of the common fund awarded as attorneys' fees, the court need not precisely define the appropriate rates for this district.

[8]  In addition to the 89.9 hours that attorney Ottinger struck from his billing records as stated in his supplemental declaration (Doc. No. 60 at ¶ 20), the court will make the following adjustments:  (i) attorney Sutton's billed hours are reduced by 38.3 hours—23.3 hours which were billed on June 29, 2021 under the entry "filed SAC" and 15 hours of the purported 20 hours he expects to bill *after* having already submitted the pending motion (Doc. Nos. 56-2 at ¶ 13; 56-3 at 22); and (ii) the hours billed for Advocates' paralegals (Alan Jimenez and Andrea Rincon) are struck because no supporting billing records have been submitted (Doc. No. 56-2 at ¶ 13).

[9]  The court calculated the lodestar for as follows:  Palau (14.5 hours x $750) + Sutton (476 hours x $720) + Trabucco (40.1 hours x $650) + Jimenez (0) + Rincon (0) + Ottinger (43.9 hours x $650) + Dusenbery (17.9 hours x $575) + Pellouchoud (6 hours x $550) + Mailhot (27.3 hours x $575) + Ali (27.5 hours x $450) + Galindo (10.2 hours x $550) + Ottinger firm's ten paralegals (92.1 hours x $260) = $479,416.  (*See* Doc. Nos. 56-2 at ¶ 13; 60 at ¶ 22.)

26

1    **B.    Expenses of Class Counsel**

2            Additionally, class counsel seeks to recover the costs expended on this litigation.  Expense

3    awards "should be limited to typical out-of-pocket expenses that are charged to a fee paying client

4    and should be reasonable and necessary."  *In re Immune Response Secs. Litig.*, 497 F. Supp. 2d

5    1166, 1177 (S.D. Cal. 2007).  These can include reimbursements for:  "(1) meals, hotels, and

6    transportation; (2) photocopies; (3) postage, telephone, and fax; (4) filing fees; (5) messenger and

7    overnight delivery; (6) online legal research; (7) class action notices; (8) experts, consultants, and

8    investigators; and (9) mediation fees."  *Id.*

9            Here, class counsel requests reimbursement of their actual expenses in the amount of

10   $11,101.30.  (Doc. No. 56-1 at 26.)  The court has reviewed class counsel's declaration and finds

11   all the expenses incurred to be reasonable.[10]  (Doc. Nos. 56-2 at ¶ 13, 15; 56-5 at ¶ 18.)

12   Accordingly, the court will approve their reimbursement of expenses in the amount requested.

13   The remaining balance from the estimated $20,000 in litigation costs (i.e., $20,000 less

14   $11,101.30) shall be added to the net settlement amount to distributed to class members pursuant

15   to the settlement agreement.  (Doc. No. 54-1 at 9.)

16   **C.    Incentive Award**

17           "Incentive awards are fairly typical in class action cases."  *West Publ'g Corp.*, 563 F.3d at

18   958–59.  However, the decision to approve such an award is a matter within the court's

19   discretion.  *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 463 (9th Cir. 2000).  Incentive

20   awards are meant to "compensate class representatives for work done on behalf of the class, to

21   make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to

22   recognize their willingness to act as a private attorney general."  *West Publ'g Corp.*, 563 F.3d at

23

---

24   [10]  Confusingly, attorney Ottinger stated in a footnote in his supplemental declaration filed with
     the court after the final approval hearing that, "[t]he total litigation expenses of $10,635.42 also
25   includes $465.88 in litigation costs incurred by my co-counsel, Advocates for Worker Rights
     LLP."  (Doc. No. 60 at 8 n.1.)  However, it is not apparent to the court how the $465.88 in
26   detailed expenses documented in the Advocates firm's declaration are accounted for in attorney
     Ottinger's supplemental declaration.  (*Compare* Doc. No. 56-2 at ¶¶ 13 – 14 *with* Doc. No. 60 at ¶
27   23.)  Thus, the court will ignore attorney Ottinger's footnote and grant the originally requested
     amount in expenses.
28

958–59.  The Ninth Circuit has emphasized that "district courts must be vigilant in scrutinizing all incentive awards to determine whether they destroy the adequacy of the class representatives . . . . [C]oncerns over potential conflicts may be especially pressing where . . . the proposed service fees greatly exceed the payments to absent class members."  *Radcliffe v. Experian Info. Sols., Inc.*, 715 F.3d 1157, 1165 (9th Cir. 2013) (internal quotation marks and citation omitted).  A class representative must justify an incentive award through "evidence demonstrating the quality of plaintiff's representative service," such as "substantial efforts taken as class representative to justify the discrepancy between [her] award and those of the unnamed plaintiffs."  *Alberto v. GMRI, Inc.*, 252 F.R.D. 652, 669 (E.D. Cal. 2008).  Incentive awards are particularly appropriate in wage-and-hour actions where a plaintiff undertakes a significant "reputational risk" by suing their former employer.  *West Publ'g Corp.*, 563 F.3d at 958–59.  The district court must evaluate such awards individually, using "relevant factors includ[ing] the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, . . . the amount of time and effort the plaintiff expended in pursuing the litigation . . . and reasonabl[e] fear[s of] workplace retaliation."  *Staton*, 327 F.3d at 977 (quoting *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998)).

In the Ninth Circuit, courts typically find an incentive award of $5,000 to be "presumptively reasonable."  *See, e.g.*, *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d at 457, 463 (9th Cir. 2000) (endorsing $5,000 service awards to named representatives); *Bellinghausen v. Tractor Supply Co*., 306 F.R.D. 245, 246 (N.D. Cal. 2015) (collecting cases); *In re Toys R Us-Del., Inc. FACTA Litig.*, 295 F.R.D. 438, 470–72 (C.D. Cal. 2014) (awarding plaintiffs $5,000 each "consistent with the amounts courts typically award as incentive payments").  Higher incentive award amounts can be appropriate, such as in employment actions, where a plaintiff risks retaliation or blacklisting by suing her employer.  *See, e.g.*, *Buccellato v. AT&T Operations, Inc.*, No. 5:10-cv-00463-LHK, 2011 WL 4526673, at *4 (N.D. Cal. June 30, 2011).

Here, Plaintiff Arrendondo seeks an incentive award in the amount of $10,000, which is over eleven times larger than the average settlement payment to class members under this settlement agreement.  (Doc. No. 56-1 at 17.)  Plaintiff contends that not only is the amount

"consistent with approved settlements in nearby districts," but also is "especially warranted" in an employment action where lending plaintiff's name for the benefit of the class constitutes a risk of facing adverse actions by employers and co-workers. (*Id.*)  Plaintiff has submitted a declaration stating that she proceeded with this action despite "considerable risks," including "the prospect that I may be liable for [defendant's] litigation costs if I was unsuccessful." (Doc. No. 56-4 at ¶ 6.)  Plaintiff's declaration detailed how she assisted class counsel "with the prosecution of the case from the outset" and spent a "significant amount of time"—approximately 148 hours— working on the case. (*Id.* at ¶¶ 7, 14.)  Specifically, plaintiff contends that over the past three and half years she spent:  (i) approximately 75 hours contacting and communicating with over 30 fellow employees who worked for defendant in relation to plaintiff's counsel's investigation of the case; (ii) approximately 40 hours gathering records relating to her work at defendant, meeting with counsel in person "to go over the facts in my case and to prepare for my deposition"; (iii) approximately 15 hours receiving updates from attorneys and answering their questions; (iv) approximately 10 hours preparing for and participating remotely for the mediation that led to this settlement; (v) approximately eight hours after mediation discussing settlement with her counsel and "other current and former" workers. (*Id.* at ¶¶ 7–11.)  Lastly, plaintiff maintains that she assisted her counsel in seeking the correct documents, data, and other evidence from defendant that could ultimately be used to prove plaintiff's alleged claims, including identifying the security alarm records that supported the unpaid wage claims. (*Id.* at ¶ 9.)

Although the incentive award sought—$10,000 or 0.8% of the gross settlement amount— is on the higher end, it is not unreasonable or beyond the norm for this district. *See, e.g.*, *Castro*, 2021 WL 2042333, at *13 (granting a $10,000 incentive award for 70 hours of work over three years, reflecting 0.025% of the gross settlement amount); *Acosta v. Evergreen Moneysource Mortg. Co.*, No. 2:17-cv-00466-KJM-DB, 2019 WL 6051117, at *18 (E.D. Cal. Nov. 15, 2019) (granting a $10,000 incentive award for 40 hours of work, reflecting 2.85% of the gross settlement amount); *Aguilar v. Wawona Frozen Foods*, No. 1:15-cv-00093-DAD-EPG, 2017 WL 2214936, at *8 (E.D. Cal. May 19, 2017) (approving an incentive award of $7,500 to each class representative where average class recovery was approximately $500).  In light of plaintiff's

supporting declaration detailing her assistance with this case, the court finds the requested incentive payment of $10,000 plaintiff Arredondo is fair and reasonable and does not destroy the adequacy of class representation in this case.  Accordingly, the court will award the incentive payment as requested.

**D.      Settlement Administrator Costs**

The court previously approved the appointment of Phoenix as the settlement administrator in this action.  (Doc. No. 55 at 32.)  According to the declaration of Kevin Lee, Case Manager for Phoenix, the total cost for administration of this settlement, including fees incurred and future costs for completion, is $10,500.00.  (Doc. No. 56-6 at ¶ 15.)  The court finds these administration costs reasonable and will direct payment in the requested amount.

**CONCLUSION**

For the reasons stated above:

1.      Plaintiff's motion for final approval of the class action settlement, an award of attorneys' fees and costs, and an incentive service award for the class action representative (Doc. No. 56) is granted;

2.      The court approves the parties' settlement as fair, reasonable, and adequate.

3.      The court awards the following sums:

     a.      Class counsel shall receive $416,666.25 in attorneys' fees and $11,101.30 in expenses;

     b.      Plaintiff Arredondo shall receive $10,000.00 as an incentive payment;

     c.      Phoenix, shall receive $10,500.00 in settlement administration costs; and

     d.      The parties shall direct payment of 75 percent of the settlement allocated to the PAGA payment, or $75,000.00, to the California Labor and Workforce Development Agency as required by California law, and the remainder of the PAGA payment, or $25,000.00, shall be included in the net settlement amount;

4.      The parties are directed to effectuate all terms of the settlement agreement and any deadlines or procedures for distribution set forth therein;

5.     This action is dismissed with prejudice in accordance with the terms of the parties'
amended settlement agreement, with the court specifically retaining jurisdiction
over this action for the purpose of enforcing the parties' settlement agreement; and

6.     The Clerk of the Court is directed to close this case.

IT IS SO ORDERED.

Dated:   **June 6, 2022**

_____
UNITED STATES DISTRICT JUDGE

31